THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CORY SAFFORD, Defendant-Appellant.

First District (1st Division)   No. 1—06—3083

Opinion filed June 1, 2009.

WOLFSON, J., dissenting.

Andrea D. Lyon, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald and Samuel Shim, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GARCIA delivered the opinion of the court:

Following a jury trial, Cory Safford was convicted of aggravated battery with a firearm and attempted murder of Harvey police officer John Marcano. He was sentenced to natural life in prison under the habitual criminal sentencing statute. The defendant advances numerous claims. His first claim is that the trial court committed reversible error when it allowed a fingerprint examiner to testify to his conclusion that a print found on the complainant's vehicle belonged to the

defendant without providing an evidentiary foundation for his opinion. For the reasons that follow, we agree; we reverse and remand for a new trial.

## BACKGROUND

On January 21, 1998, Officer John Marcano of the Harvey police department was on patrol, when shortly after midnight on the 22nd of January, he came across Antoine Pate, an individual he recognized, standing on the street with an individual he did not know. Officer Marcano, knowing Pate was wanted on a robbery charge, stopped both men, asked for identification, and had them place their hands on his patrol car. Pate provided Officer Marcano with his identification card. When the second man was unable to produce a state identification card, Officer Marcano asked him to provide something with his name on it. As Officer Marcano held Pate's identification in his left hand, he used a device on his lapel to call for backup. As he did, the second individual took out a gun and shot him twice. Officer Marcano survived the shooting. The defendant was arrested the evening of January 22, 1998. After a jury trial, the defendant was found guilty.

### Trial Proceedings

Prior to trial, defense counsel filed a motion to dismiss based on Harvey police officer Gentry's claim that Officer Marcano was "out of it" and unable to speak when he identified the defendant from a photo array. The trial court denied the motion.

At trial, Officer Marcano testified the individual who shot him on January 22, 1998, was the defendant. He recalled the defendant was wearing a derby hat, a "[b]eautiful three-quarter length leather coat," and a "[n]icely pressed denim shirt and matching pants." When the defendant was arrested, he identified a black leather three-quarter length coat as his. Officer Marcano testified that after he asked the men for identification, he had them place their hands on the patrol car. Pate placed his hands near the windshield and the defendant placed his near the headlight. Officer Marcano testified that prior to being shot, he was three feet from the individuals and could observe their faces. Officer Marcano testified he was shot in the shoulder and fell to the ground. While he lay there, the defendant stood over him and shot him in the face. Officer Marcano closed his eyes and pretended to be dead. He heard footsteps running away, one set to the north and one to the south. Then, he felt a set of footsteps coming toward him from the south and someone took Pate's identification card out of his hand and ran off. Officer Marcano called for assistance and identified one of the offenders as Antoine Pate. Officer Marcano testified he gave a physical description of the second offender, but the

police transmission tape does not contain a description from Officer Marcano.

Officers Forbes and Murphy arrived at the scene. Officer Michael Murphy testified that at the scene, Officer Marcano mentioned Pate as one of the offenders and described the second offender as a black male, 5 feet 4 inches to 5 feet 6 inches in height, wearing a black derby hat and a black leather coat. Officer Marcano is 5 feet 7 inches. After accompanying Officer Marcano to the hospital, Officer Murphy went back to the scene of the shooting. In preparing his report of the shooting, Officer Murphy listed an individual named Lee Cole, 5 feet 6 inches tall, weighing 135 pounds, as the suspected shooter. Officer Murphy testified Officer Marcano never mentioned the name Lee Cole to him.

At the hospital, on the day of the shooting, Officer Marcano was shown three sets of photo arrays. From the two arrays shown during the early morning, Officer Marcano identified Antoine Pate as one of the offenders. Officer Marcano identified no one else from the two arrays. Around 6:30 p.m. that day, Detective Thomas and Commander Arnold of the Harvey police department showed Officer Marcano additional photographs from which he identified the defendant as the shooter. He also identified a derby hat and black jacket depicted in a photograph as similar to the hat and jacket worn by the shooter. At the hospital, Officer Marcano marked photographs of his patrol car where Pate and the shooter placed their hands.

In court, Officer Marcano testified that he described the shooter as being 5 feet 6 inches to 5 feet 7 inches in height in his 911 call. Officer Marcano admitted he never saw a lineup and that at the time of the identification he was on pain medication that made him somewhat drowsy. Dr. Scott Donnelly testified Officer Marcano was receiving morphine at the time of the photo identification.

Toni Powe testified she witnessed the shooting. She testified that on the night in question, she was riding on a public bus with her sister, the bus driver. After being dropped off shortly after midnight, she saw Officer Marcano, Pate, and another individual standing in the street as she was on her way home. Ms. Powe was acquainted with Officer Marcano. She later identified the unnamed individual as the defendant, though she did not know him on the night of the shooting. Ms. Powe's description of the shooting corroborated Officer Marcano's testimony. She testified that she watched the shooting while hiding in some nearby bushes. She recalled the shooter wore a derby hat and black jacket. Ms. Powe testified that Pate ran to Tina Butler's house after the shooting and that the defendant ran through a vacant field to Margaret Williams's house, before ending up at Tina Butler's house.

On cross-examination, Ms. Powe admitted that on the night of the offense, she gave the police Pate's name, but not the defendant's. She testified that she told the officers that night that she did not know the other individual involved. In February 2002, about four years after the shooting, Ms. Powe met with a prosecutor who showed her some photographs. From the photo array, Ms. Powe identified Pate and the defendant as the offenders in the shooting of Officer Marcano.

Sergeant Eric Douglas spoke with Officer Marcano at the hospital on the night of the shooting. Later that morning, Sergeant Douglas went to the scene of the shooting with Commander Wells. At the scene, they had a brief conversation with a woman, later determined to be Toni Powe. At the time of their conversation, Ms. Powe expressed apprehension and declined to disclose her name. On cross-examination, Sergeant Douglas admitted that during their initial conversation, Ms. Powe did not state that she saw the shooting or that she knew the other man with Pate. Sergeant Douglas testified Ms. Powe told him that the man with Pate was wearing a blue jumpsuit.

Over defense counsel's objection, the State elicited testimony from Sergeant Douglas that after talking with Margaret Williams, who lived across the street from the scene of the shooting, Harvey police officers sought Pate and an individual named "Cory." Sergeant Douglas testified that after his conversation with Ms. Williams, he discovered a derby hat and two guns close to the scene of the shooting.

In his testimony, Detective Joseph Thomas described the defendant as 5 feet 8 inches to 5 feet 9 inches and between 180 and 190 pounds, with long hair. He admitted that at the start of the investigation, the search was for an individual who was 5 feet 4 inches to 5 feet 6 inches.[1] Detective Thomas also testified regarding the photo identification at the hospital by Officer Marcano. Detective Thomas testified five photos were used in the photo array he showed to Officer Marcano. Detective Thomas admitted that four of the five photographs had similar backgrounds and listed the height of the individuals depicted. The photograph of the defendant differed in background and did not list a height for the defendant. Officer Marcano identified the defendant as the shooter from this photo array.

Derrick Jones, while serving a nine-year sentence in the Illinois Department of Corrections, with prior felony convictions for unlawful use of weapons, delivery of a controlled substance and obstruction of

---

[1]The defendant includes more details in his brief of the possible involvement of this individual, later identified as Lee Cole, in the shooting. This information was provided by the girlfriend of Lee Cole to the Harvey police. However, this information was barred as hearsay at trial.

justice, testified he sold a gun to the defendant, whom he knew as "Squeak." He identified the bluesteel revolver recovered by Sergeant Douglas near the scene of the shooting as the gun he sold to the defendant.

Walter Sherk, a forensic scientist in the field of firearms investigations with the Illinois State Police, testified as an expert to the comparison tests he performed on a recovered bullet and the recovered handgun. Forensic scientist Sherk concluded that the bullet recovered from the scene of the shooting was fired from the recovered gun.

Prior to the second day of trial, defense counsel objected to any testimony by the fingerprint expert because the fingerprint reports received in discovery did not list any points of comparison from which the expert could have drawn his conclusion of a match. The objections were noted, but the court ruled the fingerprint examiner would be allowed to testify to his conclusions. Testimony regarding the recovery of latent fingerprints and the comparison prints of the defendant was presented before the fingerprint examiner testified.

Jill Hill, a crime scene technician for the Illinois State Police, testified she recovered latent prints from Officer Marcano's patrol car at the scene of the shooting. She confirmed that she photographed a footprint at the scene, but no further action on the footprint was taken by the crime lab.

Walter Pleasant, an investigator with the Cook County State's Attorney's office, testified he took the prints of the defendant to compare with the latent prints.

Brent Cutro, a forensic scientist latent print examiner for the Illinois State Police, testified as an expert witness. Mr. Cutro testified 45 latent prints were recovered from Officer Marcano's vehicle. Based on the number of latent prints recovered, defense counsel requested a sidebar. At the sidebar, defense counsel noted that the tendered discovery listed only 22 latent prints; she was surprised by the mention of 23 additional latent prints. Without addressing the discrepancy in the number of latent prints recovered, the State responded it tendered all reports in discovery. The court noted defense counsel's objection but allowed Mr. Cutro to proceed with his testimony. Mr. Cutro testified that in November of 1998 he compared the inked print card of Pate's fingerprints to that of a latent print recovered from the upper left corner of the windshield of Officer Marcano's patrol vehicle and concluded the two prints matched. Over defense counsel's objection, Mr. Cutro testified that on February 21, 2006, he determined that one latent print found on the lower left corner part of the hood of Officer Marcano's patrol car matched the inked print card of the defendant. Mr. Cutro testified this was a confirmatory test, as he had

reached the same conclusion when he compared the latent print to the defendant's print card on January 26, 1998.

Mr. Cutro testified his practice is to look at three levels of detail on each fingerprint during his analysis in order to come up with points of comparison. He testified he makes no notes when he finds points of comparison, nor does he record how or why he arrives at his conclusions. He notes only whether a latent print matches a known print. Mr. Cutro never testified to any number of points of comparison that he found between the latent print from the patrol car and the defendant's print. Mr. Cutro acknowledged that during his fingerprint examination he used a magnifying glass.

With the testimony of Mr. Cutro, the State rested. The defendant's motion for a directed finding was denied.

Commander Roy Wells of the Harvey police department testified for the defense. Commander Wells testified that in the course of his investigation of the shooting of Officer Marcano, he was flagged down by Ms. Powe while on patrol on January 22, 1998. Ms. Powe indicated she had some information about the shooting. Ms. Powe was nervous when she spoke to Commander Wells, who was with Sergeant Douglas at the time. Ms. Powe did not state at the time of this initial contact that she actually saw the shooting. However, she did mention that on the night of the shooting, one of the individuals involved was wearing a blue outfit. Based on his conversation with Ms. Powe, Commander Wells, with Sergeant Douglas, proceeded to interview Margaret Williams.

Officer Merritt Gentry admitted he told the State that Officer Marcano's identification of the defendant was unfair because Officer Marcano was "out of it" when he identified the defendant as the shooter. However, Officer Gentry testified that his initial claim that the identification was unfair was untrue, caused by his anger with Detective Thomas.

Kathleen Long testified that in January of 1998, she was the office manager for G.M. Realty and, as such, was responsible for hiring and training sales associates. Ms. Long met the defendant at a community rally. When the defendant inquired about a job, she hired him to manage her investment property at 12024 S. Stewart in Chicago. Ms. Long testified that on January 21, 1998, she hosted a seminar and open house at her investment property, assisted by the defendant. The seminar and open house was scheduled to last from 8 p.m. until 10:30 p.m. While most of the seminar participants left by 10:30 p.m., some remained. The last person left at about 1 a.m. on January 22, 1998. Ms. Long testified she lived close to her investment property and arrived home at 1:15 a.m. Ms. Long testified that the defendant was

present the entire time she was at the seminar and open house and he remained at the event after she left. Ms. Long also recalled that the defendant wore an all-white outfit that night.

Two other witnesses, Blanche Ivey and Lashanda Morgan, testified to the defendant's presence at the open house and seminar that evening.

Blanche Ivey testified she arrived at the seminar around 8:30 p.m. When Ms. Ivey arrived, she was greeted by the defendant, who was wearing a white suit. Ms. Ivey stayed at the event until sometime around 12:45 a.m. She testified that when she left, the defendant was still there. Ms. Ivey contacted the defendant's defense counsel after hearing about the case on the radio.

Lashanda Morgan confirmed the defendant was at the seminar on the night of the shooting. Ms. Morgan left the seminar at the same time as Ms. Long. When they left, Ms. Morgan recalled that the defendant was still there and dressed in all white. She also learned of the defendant's case from the radio.

The defense rested and closing arguments began the next day. Defense counsel objected to certain remarks made by the prosecution during the course of the arguments. The specific remarks were not listed in the defendant's posttrial motion.

The jury was instructed and began its deliberation. The jury found the defendant guilty of attempted first-degree murder and aggravated battery with a firearm to a police officer.

### Postverdict Proceedings

After the jury returned its verdicts, two notes sent out during its deliberations were spread of record by the trial judge.

"THE COURT: There was a note that came out at one point early on where they wanted a magnifying glass. Of course, we do not have a magnifying glass, and the Court instructed them to continue to deliberate. And there was another note about an hour, hour and a half ago, where they said they could not reach a unanimous decision. And at that particular time, the Court advised them, with the consent of the attorneys, that they were basically, in layman's terms, to take a second look. They were not representing one side or the other. Look at it with objective minds and consider other peoples' viewpoints. That's a layman's recitation of the facts. Both sides concur?"

The defense and the prosecution agreed with the trial court's summary.

Posttrial, the defendant hired attorney Anita Carothers to represent him at the sentencing and during his motion for a new trial. On May 24, 2006, attorney Carothers requested leave to file an ap-

pearance and a petition for extension of time to file supplemental motions for a new trial. The trial court denied attorney Carothers leave to file an appearance, informing her that she could file an appearance after sentencing.

On July 6, 2006, the defendant was sentenced to natural life in prison under the habitual criminal sentencing statute. On October 2, 2006, a hearing was held on the defendant's second motion for a new trial and motion to reconsider the sentence; the motions were denied. This timely appeal followed.

Appellate counsel supplemented the record with a sworn affidavit of defense counsel, referred to on the attached notice of motion as a "Bystander's Report." It appears the substance of the "Bystander's Report" was approved by the trial judge at a hearing on June 20, 2007, the transcript of which is in the record.

## ANALYSIS

The defendant advances nine claims on appeal: (1) the trial court erred in allowing the fingerprint examiner to testify to his conclusion that a print found on the complainant's vehicle belonged to the defendant without disclosing any points of comparison; (2) Illinois courts should adopt the rule established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), in place of the current standard we adopted from *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), to judge the admissibility of scientific evidence; (3) the trial court abused its discretion in instructing the deadlocked jury under *People v. Prim*, 53 Ill. 2d 62, 289 N.E.2d 601 (1972), or, in the alternative, by not providing the full instruction; (4) the trial court erred by not protecting his right to be present during critical events of the trial; (5) the trial court abused its discretion by prohibiting him from employing new counsel for his motion for a new trial; (6) the trial court erred by overruling defense counsel's objection to the admission of hearsay by employing the "course of investigation" exception; (7) he was denied effective assistance of counsel; (8) he was deprived a fair trial due to prosecutorial misconduct; and (9) the cumulative effect of the multiple errors committed in his case denied him his due process rights.

■ We reverse for a new trial based on the first claim only. We find the trial court's decision to allow the fingerprint expert to testify where the expert did not provide an evidentiary foundation for his testimony impermissibly curtailed the defendant's right to challenge that testimony in cross-examination, which negatively impacted the defendant's right to a fair trial under the facts of this case. We briefly address certain of the defendant's other claims at the conclusion of our discussion on the expert's testimony.

## Fingerprint Expert's Testimony

Brent Cutro, a forensic scientist and latent fingerprint examiner for the Illinois State Police Joliet laboratory with 24 years of experience, was qualified as an expert in this case. Examiner Cutro explained the general process he follows in fingerprint identification. He testified he looks at three levels of detail of each fingerprint undergoing an analysis, explaining what he looks for at each level. Examiner Cutro testified that on February 21, 2006, he conducted a latent print examination and concluded the inked print card of the defendant matched the latent print recovered from the lower left corner of the hood of Officer Marcano's patrol car. Examiner Cutro reached the same conclusion when he conducted the examination on January 26, 1998, using a different inked print card of the defendant's prints. He testified that each of his print identifications was verified by another examiner. Based on his experience and training, examiner Cutro concluded the print recovered from Officer Marcano's squad car, near the headlight, could belong to no other person than the defendant.

On cross-examination, examiner Cutro admitted that during the fingerprint examination he did not note the points of comparison he found. Examiner Cutro testified he would have observed the points of comparison in examining the Level Two detail. Examiner Cutro is among a group of experts that does not exclusively base his ultimate opinion as to identification on the points of comparison. He testified he made "matrix notes" in reaching his opinion, but admitted his notes do not explain how he reached his opinion in this case. Examiner Cutro explained that he does not make notes as to his visual examination of the prints he is comparing; he merely notes whether there is or is not an identification.

The defendant contends the trial court erred in allowing examiner Cutro to testify to his conclusion that the latent print recovered from Officer Marcano's patrol car belonged to the defendant without ever testifying, on either direct or cross-examination, to the evidentiary basis for his opinion. In his main brief, the defendant contends that to allow opinion testimony based solely on the qualifications of the witness as an expert, without disclosing the basis for the opinion "would be to invite forensic fraud." The defendant attacks the fingerprint identification testimony that the trial court allowed as equivalent to allowing examiner Cutro "to testify in essence: I am an expert and you have to take my word for it." The defendant argues the trial court erred by not requiring the State to offer an adequate foundation in the form of the expert's underlying reasoning to explain the expert's ultimate conclusion presented to the jury. This error, the defendant contends, was prejudicial and requires reversal because the evidence

against him was weak and contradicted by the testimony of three solid alibi witnesses.

In its brief, the State sets out the testimony of examiner Cutro that it contends provides evidentiary support for his conclusion:

"[Examiner Cutro explained] that the 'analysis phase would be looking at Level One detail. *** The comparison phase would be comparing the latent and going from the latent and looking at target individual characteristics or that Level Two and Level Three detail that I spoke about, and trying to find those say ending ridges or bifurcations in sequence, and see if—that they match in sequence to the known standards.' "

At oral argument, the State conceded that no "Level One, Level Two, or Level Three" detail of the comparison process involving the latent print and the defendant's known print was ever testified to by examiner Cutro. We have examined the record and agree with the State. We find no testimony by examiner Cutro as to how he arrived at his conclusion that the latent print in question could only belong to the defendant. Examiner Cutro testified on cross-examination that Level Two detail focuses on the points of comparison. When asked whether he noted the number of points of comparison, examiner Cutro answered "No." He made no notes as to the number of points of comparison. Examiner Cutro was asked directly, "Do your notes tell us how you reached your opinion, sir?" He answered, "No." While he explained generally how he makes an identification, with respect to the latent print being identified as the defendant's, examiner Cutro admitted there are no notes that say how he reached his opinion. Examiner Cutro admitted his notes list his opinion only, which he termed "a conclusion."

It is left to the discretion of the trial court to determine whether an expert's testimony may be properly admitted. *People v. Mack*, 128 Ill. 2d 231, 250, 538 N.E.2d 1107 (1989). However, "the admission of an expert's testimony requires the proponent to lay an adequate foundation establishing that the information upon which the expert bases his opinion is reliable." *Hiscott v. Peters*, 324 Ill. App. 3d 114, 122, 754 N.E.2d 839 (2001), citing *Soto v. Gaytan*, 313 Ill. App. 3d 137, 146, 728 N.E.2d 346 (2000). It is the function of the trial court to determine whether the foundational requirements have been met. That determination presents a question of law. *Peters*, 324 Ill. App. 3d at 123 (it is "a question of law *** whether there was a sufficient basis for the expert's opinions"). We review the defendant's first claim *de novo*. *People v. Chapman*, 194 Ill. 2d 186, 217, 743 N.E.2d 48 (2000) (where the facts are not in dispute, our review is *de novo*); see *Koon v. United States*, 518 U.S. 81, 100, 135 L. Ed. 2d 392, 414, 116 S. Ct.

2035, 2047 (1996) (where the Supreme Court explained, "Little turns *** on whether we label review of this particular question abuse of discretion or *de novo*, for an abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction").

Even in the absence of the explicit evidentiary foundation for examiner Cutro's opinion, the State contends no error occurred. At oral argument, the State asserted the admission of examiner Cutro's testimony is supported by the Illinois Supreme Court's opinion in *People v. Campbell*, 146 Ill. 2d 363, 586 N.E.2d 1261 (1992), and the Fifth District's decision in *People v. Ford*, 239 Ill. App. 3d 314, 606 N.E.2d 690 (1992). In its brief, the State contends, *"Campbell* and *Ford* make it clear that latent print experts need not testify based on documentation of points of comparison made during the identification process."

In *Campbell*, the supreme court noted that no Illinois case expressly sets out the minimum number of points of similarity between a latent print and an exemplar to be sufficient for an identification.

> "[F]ingerprint evidence of identity has been held admissible in some cases [in which] the expert found five points of similarity, and in another in which the expert found only four. The courts, in those cases, took the position that the paucity of points of similarity went to the weight accorded to the evidence." *Campbell*, 146 Ill. 2d at 384.

Relying on *Campbell*, the *Ford* court rejected the defendant's claims against the fingerprint expert's testimony that linked him to the crime. *Ford*, 239 Ill. App. 3d at 317. The defendant in *Ford* argued that his "conviction was against the manifest weight of the evidence because the only evidence which connected him with the crime was a single fingerprint." *Ford*, 239 Ill. App. 3d at 317.

The issue in *Ford* does not match the issue before us. In fact, two of the three specific complaints the *Ford* defendant made were that the expert "could not make a comparison of the latent print and the standard while on the witness stand without a magnifying glass, and *** he did not have the print blown up to serve as a demonstrative exhibit." *Ford*, 239 Ill. App. 3d at 317. Neither of these two claims is even suggested before us. While the defendant in *Ford* did complain that the expert did not "state the number of similar characteristics between the latent print and the standard," the *Ford* defendant made this complaint in the context of his challenge to the sufficiency of the evidence. The defendant in *Ford* did not claim that his cross-examination of the expert was curtailed by the absence of any evidentiary foundation supporting the expert's opinion. The *Ford* court, in rejecting the defendant's complaints, ultimately concluded

that the evidence supported the defendant's conviction beyond a reasonable doubt. *Ford*, 239 Ill. App. 3d at 317.

The challenge to the fingerprint identification evidence here is directed at its admissibility. See *People v. Garth*, 353 Ill. App. 3d 108, 118, 817 N.E.2d 1085 (2004) (challenge to foundation for expert's stipulated opinion one of admissibility, not sufficiency). Our concern is whether the defendant's right to a fair trial was impacted by the admission of the expert's testimony. See *People v. Brown*, 57 Ill. App. 3d 528, 531, 373 N.E.2d 459 (1978) (where no foundational facts or reasons were given, opinion testimony attesting to causation was ruled insufficient, warranting reversal). While *Ford* is instructive, it does not control the outcome here; we address a more fundamental issue.

We also see no reason to assess the correctness of the State's claim "that latent experts need not testify based on documentation of points of comparison made during the identification procedure." Our concern over the claimed error here is not a matter of documentation; our concern is whether admitting expert testimony without a showing of the requisite foundation so curtails the ability of the defendant to challenge the conclusion drawn by the expert that it leads to a suggestion of infallibility. Admitting examiner Cutro's expert testimony, absent the evidentiary foundation, is not unlike admitting the results of a lab test without any testimony that the lab equipment used was reliable and trustworthy. If the fingerprint comparison in this case had been performed by a mechanical or electronic device, the admissibility of the result would turn on the proper functioning of the device. See *People v. Bynum*, 257 Ill. App. 3d 502, 514, 629 N.E.2d 724 (1994) ("the expert must offer some foundation proof *** that the device was functioning properly at the time it was used"). Such a foundational showing is required to ensure that the result is trustworthy and reliable. The foundational requirement is no different when the comparison is performed by a human expert. In order to ensure that the expert engaged in a trustworthy and reliable comparison process, "how" the expert arrived at his conclusion must be subject to cross-examination. A showing of "how" the expert arrived at his conclusion is the equivalent of demonstrating that the mechanical or electronic device is functioning properly. Without a real opportunity to challenge how an expert reached his conclusion, a trier of fact is left in the dark as to the reliability and trustworthiness of the result. That the jury was left in the dark here may explain its request for a magnifying glass during its deliberations, where examiner Cutro testified that he used a magnifying glass to compare the latent prints with the exemplars but gave no testimony concerning what he saw when he viewed the prints through the magnifying glass.

The State correctly points out, as noted in *Campbell*, that no Illinois decision has set a minimum number of points of similarity sufficient for identification. Nor do we establish such a minimum with our decision here. However, we do not take the observation by our supreme court in *Campbell* to mean that the opinion testimony of an expert is deemed admissible without any showing of the foundational requirements. The defense must be allowed to challenge the analytical process examiner Cutro undertook in the case at hand to arrive at his expert opinion.

Meaningful cross-examination is central to our adversarial system of justice. Cross-examination is the truth seeking engine. It is one means by which we place confidence in the outcome of a trial. While justice may be served in any particular trial, the means to the ends of justice matter. In this case, the defendant was deprived of any means to challenge the "conclusion" testimony of examiner Cutro that the latent print recovered at the spot where the shooter would have placed his hands on Officer Marcone's vehicle matched the standard taken from the defendant. It may well be that examiner Cutro was correct in his judgment; the record does not tell us. We agree with the defendant that examiner Cutro's testimony amounted to no more than "take my word for it," where no opportunity to challenge that testimony is provided. The right to challenge the reliability and trustworthiness of the adduced evidence through cross-examination is fundamental to our adversarial system of justice. See *Campbell*, 146 Ill. 2d at 376, 383 (where the supreme court, in rejecting a finding "that shoeprint evidence is unreliable, as a matter of law," observed that "while a dissimilarity in a fingerprint may not be subject to explanation, such is not the case with shoeprint evidence," which the trier of fact has the opportunity to view)[2]. Here, examiner Cutro provided no explanation for his opinion that there was a match.

A test of reliability and trustworthiness lies in the very opportunity to challenge, through cross-examination, the bottom-line conclusion that a latent print matched a standard. We read the supreme court's decision in *Campbell* to impliedly question the probative value of testimony that precludes any challenge to "how" the expert's opinion of identification was reached. "We would acknowledge that 'general problems' with the probative value of shoeprint evidence may arise in a particular case where an attempt is made at positive identification of an accused in the absence of sufficient unique, distinctive characteristics." *Campbell*, 146 Ill. 2d at 378. That is precisely the

---

[2]Once again, it seems clear that the jury here expressed a desire to view the fingerprint exhibits with the aid of a magnifying glass.

problem before us: whether there were unique, distinctive characteristics of the latent print recovered in this case ("evidence of peculiarities," in the words of the *Campbell* court) to warrant examiner Cutro's conclusion that the latent print belonged to no one other than the defendant. *Campbell*, 146 Ill. 2d at 379.

The supreme court in *Campbell* also noted the wide range of points of similarity sufficient for admissibility in fingerprint identification cases, ranging from 20 (*People v. Reno*, 32 Ill. App. 3d 754, 757, 336 N.E.2d 36 (1975)), to 5 and 4 (*Campbell*, 146 Ill. 2d at 384 ("fingerprint evidence of identity has been held admissible in some cases where the expert found five points of similarity, and in another in which the expert found only four")). The supreme court made no mention of a case involving the total absence of points of similarity or the adequacy of bald conclusions based on "matrix notes" in the testimony of an expert witness.

While the paucity of points of similarity may go to the weight of the evidence rather than admissibility (*Campbell*, 146 Ill. 2d at 384), as the paucity approaches zero, our concern is no longer with weight but with admissibility. We believe this is why the defendant here urges an issue that focuses on the admissibility of scientific evidence addressed by *Frye* and *Daubert*. While we reject that claim, the underlying concern with sham science crosses over to otherwise universally accepted scientific technique when the basis for the bottom-line opinion is withheld or not subject to scrutiny by meaningful cross-examination. To allow scientific testimony to be admitted without revealing its underlying scientific basis is to risk admitting such evidence without any scientific standards. That is a risk we find unacceptable.

We agree with the defendant's argument that although the scientific community is divided as to how many points of comparison are needed to make a positive identification, the proffered expert must be subject to challenge on the analysis he undertook to arrive at his conclusion, regardless of the method he followed. Otherwise, the basis for making a positive identification between the latent and exemplar prints is not subject to scrutiny.

Fingerprint evidence is extremely persuasive. A jury may be so swayed by such evidence that strong alibi witnesses have little chance of being found credible when fingerprint evidence points to the defendant being present at the scene of the crime. The persuasiveness of fingerprint evidence reinforces the need to require a proper foundation to establish its admissibility. "Such scrutiny is required because an expert's opinion[, particularly on an issue as complex as fingerprint analysis,] bears an aura of reliability and trustworthiness." *Gaytan*,

313 Ill. App. 3d at 146. As our supreme court stated in the context of addressing whether facts and opinions in reports on which a psychiatrist relied in reaching his diagnosis could be disclosed to the jury:

"Absent a full explanation of the expert's reasons, including underlying facts and opinions, the jury has no way of evaluating the expert's testimony [citation] and is therefore, faced with a 'meaningless conclusion' by the witness [citation]." *People v. Anderson*, 113 Ill. 2d 1, 11, 495 N.E.2d 485 (1986).

Consistent with the holding in *Anderson*, the underlying basis of an expert's opinion must be subject to cross-examination in order to allow the jury to properly evaluate that expert's testimony. If the foundation for the expert's opinion is not subject to scrutiny, the jury may ascribe an "aura of reliability and trustworthiness" to the expert's conclusion. Here, it is not that the conclusion offered by examiner Cutro is rendered meaningless; rather, it is that the conclusion is rendered unassailable where the opportunity to challenge its foundation is not provided. In the context of fingerprint analysis, the foundation for the expert's opinion that the latent print and the exemplar match must be subject to challenge. It is only after the expert is called to answer "how" he reached his conclusion that the fact finder can properly weigh the scientific evidence in the context of the other evidence presented at trial to determine whether guilt has been shown beyond a reasonable doubt.

Here, the State elicited examiner Cutro's opinion without establishing the specific scientific process he undertook to arrive at his conclusion. Examiner Cutro testified he twice compared the latent print with the known prints of the defendant. We can think of no reason examiner Cutro could not explain the Level One, Level Two, and Level Three details he must have observed on each occasion, which led him to conclude that the two prints matched. "An expert's opinion is only as valid as the bases and reasons for the opinion." *Gaytan*, 313 Ill. App. 3d at 146. It was insufficient for examiner Cutro to rely on his training and expertise as a basis for his ultimate opinion that no one other than the defendant could have left that latent print on Officer Marcano's police car. Before the jury could assess the weight and credibility of examiner Cutro's opinion, it was incumbent on the trial judge to determine whether the foundational requirements had been met for the admission of examiner Cutro's opinion. This was a question of law. "The trial court [may not] blindly accept the expert's assertion that his testimony has an adequate foundation." *Gaytan*, 313 Ill. App. 3d at 146.

We note the State did not cite *People v. O'Neal*, 118 Ill. App. 2d 116, 254 N.E.2d 559 (1969), to support its claim that no error occurred

here. The reason is clear. In *O'Neal*, the expert testified to making a comparison of the recovered bullet and test bullet with a "comparison microscope [that] consists of two identical microscopes mounted side by side and connected by an optical bridge." *O'Neal*, 118 Ill. App. 2d at 122. The expert testified that based on his observation through the comparison microscope of the two bullets, both the recovered bullet and the test bullet were fired by the same gun. *O'Neal*, 118 Ill. App. 2d at 122. The comparison microscope provided the ability to turn the test bullet to compare the "small microscopic imperfections made in the bore of the gun," which each bullet picks up as it is fired by the recovered handgun. *O'Neal*, 118 Ill. App. 2d at 121-22. The defendant in *O'Neal* did not argue that the jury was being asked by the expert to "take his word for it," as the defendant claims here, but that "either the test bullets, photomicrographs, or an explanation of the particular similarities should have been offered into evidence; and that as a result defendant's right to proper cross-examination was improperly restricted." *O'Neal*, 118 Ill. App. 2d at 122-23. In rejecting this claim, the *O'Neal* court made two observations: "The admissibility of expert testimony is conditioned upon the laying of a proper factual foundation. [Citation.] Where the expert bases his opinion upon facts personally known to him, he must testify to those facts." *O'Neal*, 118 Ill. App. 2d at 123. These observations place the *O'Neal* decision on the same footing as *Ford*. Neither is at odds with our holding here that facts must be presented to support an expert's conclusion.

In this regard, we agree with the dissent that the "jury *** was being asked to accept an opinion that was short of supporting details. [And that] [c]ross-examination on the point was vigorous." 392 Ill. App. 3d at 232. Our problem with the expert testimony here is that examiner Cutro claimed to base his opinion "upon facts personally known to him, [but] he [was unable to] testify to those facts." *O'Neal*, 118 Ill. App. 2d at 123. That vigorous cross-examination occurred as to the absence of details is hardly an adequate test of the substance of examiner Cutro's opinion.

There are at least two fertile grounds for cross-examination of an expert: the substance of the expert's opinion and the manner in which he arrived at his opinion. The instant case left defense counsel with no option but to focus on the manner in which examiner Cutro arrived at his opinion. No doubt examiner Cutro's lack of detail of the facts supporting his opinion was made clear to the jury. However, while a comparison of bullets, much like DNA evidence, can lead to certain identification, fingerprint examination, as recognized by our supreme court with its observation that points of comparison in our jurisprudence range from 4 to 20, is far more subjective, as examiner Cutro

also acknowledged when he agreed that it is "a process that's subject to human interpretation." Nor are we aware of any case that suggests either DNA testing or comparison of fired bullets involves the subjective input of the examiner. Critical to testing the subjective nature of the fingerprint identification is a disclosure of the points of comparison the examiner claims are present between the latent print and the exemplar, to which the conclusion of a match is inextricably tied. On our close review of examiner Cutro's testimony, this case falls far short of the foundation bar set by *O'Neal* and *Ford*.

Finally, to require the State to lay an adequate foundation for examiner Cutro's opinion can hardly be described as an undue burden. The defendant objected to examiner Cutro's testimony before he took the stand. More than sufficient notice was provided to the State to correct any deficiency in examiner Cutro's proposed testimony. See *Bynum*, 257 Ill. App. 3d at 514-15 ("a timely and specific objection allows the State the reasonable opportunity to correct any deficiency in the foundation proof"). Examiner Cutro was asked by the defense to do no more than to explain how he reached his ultimate opinion in this case. Absent an explanation that established the legal foundation for the introduction of examiner Cutro's ultimate opinion, the admission of his opinion was error.

## Harmless Error

The State argues that even if the fingerprint evidence was admitted in error, the error was harmless.

The erroneous admission of evidence will not be held reversible if there is no reasonable probability the jury would have acquitted the defendant had the evidence not been admitted. *People v. Hunley*, 313 Ill. App. 3d 16, 32, 728 N.E.2d 1183 (2000). The State argues no such reasonable probability exists here because in any event "the jury would have found defendant guilty based on the overwhelming evidence."

It is not clear to us that the jury would have convicted the defendant had the fingerprint evidence not been admitted. The evidence adduced at trial, set out at length in the Background section of this decision, amply demonstrates the closeness of the evidence in this case. Nonetheless, we make three additional observations.

First, we begin with the overarching nature of the State's case. This was, in essence, an identification case. Credible challenges were advanced against each of the two eyewitnesses: Ms. Powe and Officer Marcano.

Officer Marcano's identification was challenged on several fronts. First, there was the discrepancy in the description Officer Marcano

gave to Officer Murphy, according to Officer Murphy's testimony. Officer Marcano, who stands 5 feet 7 inches, described the shooter as slightly shorter, 5 feet 4 inches to 5 feet 6 inches. While latitude in estimating height is reasonably given to a lay witness, a jury is free to demand more of a trained officer, especially where the officer states the offender was not taller than he. See *People v. Nichols*, 32 Ill. App. 3d 265, 268, 336 N.E.2d 194 (1975) (significant issue is whether discrepancy in height casts doubt on adequate opportunity for definite identification). The State's reliance on a photo identification by Officer Marcano while in the hospital may also have been seen by the jury as casting doubt on the reliability of his identification. The attending doctor testified that Officer Marcano was receiving morphine at the time of his identification. We also note no lineup identification was ever undertaken, even though the defendant was in custody within 24 hours after the shooting. To the extent Officer Marcano was in no condition to take part in a lineup identification because of his injuries, his condition casts doubt on his photo identification; to the extent Officer Marcano was fully cognizant to have participated in a lineup identification following his photo identification, the very absence of a lineup identification may undercut the reliability of the photo identification.

Ms. Powe was also never asked to participate in a lineup identification. While she unquestionably identified the defendant from a photo array, the photo identification did not occur until nearly four years after the shooting. No explanation was offered for the absence of a lineup identification involving Ms. Powe, where, after the defendant was formally charged, defense counsel would have had the right to be present. See *People v. Green*, 282 Ill. App. 3d 510, 518, 668 N.E.2d 158 (1996) (after sixth amendment right to counsel attaches, the defendant has right to have counsel present at lineup).

Second, adding to the closeness of the evidence was the substantial nature of the defendant's alibi defense. We find nothing in the record to suggest the three alibi witnesses were anything other than unbiased witnesses. Ms. Ivey and Ms. Morgan only came forward after hearing about the case on the radio. There is nothing in the testimony of the three alibi witnesses that would support the conclusion that the jury dismissed their testimony out of hand.

Finally and related to our second point, without the fingerprint evidence, the testimony of the defendant's alibi witnesses would be unchallenged by scientific evidence. Absent examiner Cutro's testimony that the defendant's prints matched those recovered from the patrol car, the only evidence of the defendant's presence at the scene, would have been the challenged identifications by Officer Mar-

cano and Ms. Powe. Thus, the jury's verdict would turn on the credibility of the conflicting witnesses and the weight accorded to their respective testimony. The fingerprint evidence might well have tipped the scale in favor of a finding by the jury of proof of guilt beyond a reasonable doubt. We cannot say with confidence that absent the fingerprint identification evidence, the jury would have returned a guilty verdict. While playing no major role in our decision, we note that the jury, after several hours of deliberation, indicated it was deadlocked. While no mistrial was declared, the jury's difficulty in arriving at a unanimous verdict prompted the trial court to instruct pursuant to *Prim*. See *People v. Stechly*, 225 Ill. 2d 246, 310, 870 N.E.2d 333 (2007) (deadlocked jury leading to a mistrial is consistent with the evidence being close). Under the facts present in this case, we conclude the admission of examiner Cutro's expert opinion is reversible error.

Based on our review of the complete record, we reject the State's contention that the evidence was so overwhelming that any error that might have occurred at trial was harmless.[3]

## *Frye* Standard

■ The defendant contends Illinois courts should adopt the rule established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), over the current standard outlined in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), for the admissibility of expert testimony. We are unpersuaded that the choice of standard makes any difference in this case. Nor has the defendant established that he raised this issue below. Finally, we have previously made clear that we are bound to the *Frye* standard "until our supreme court adopts a new test." *Donnellan v. First Student, Inc.*, 383 Ill. App. 3d 1040, 1057, 891 N.E.2d 463 (2008).

## Remaining Claims

We see no need to address the remaining claims of the defendant because the claims either were not preserved below or add little to our decision to remand for a new trial.

## CONCLUSION

The trial court erred in admitting the testimony of the fingerprint identification expert where the foundation requirements were not

---

[3]At oral argument, the State suggested we need only examine the incriminating evidence, presumably based on the State's case in chief, to determine whether the evidence is overwhelming. No authority is provided for such a claim, which we find at odds with the very purpose of cross-examination and defense-adduced evidence—to discredit the incriminating evidence.

met. This was reversible error where the evidence was not overwhelming. A new trial is ordered.

Reversed and remanded.

HALL, J., concurs.

JUSTICE WOLFSON, dissenting:

There is a disquieting paucity of detail to support examiner Cutro's opinion that the defendant's fingerprint was on the windshield of Officer Marcano's squad car. I believe, however, Cutro's testimony was sufficient, barely, to place his conclusions before the jury. That is, the lack of testimony concerning the number of points of comparison went to the weight of Cutro's opinions, not their admissibility.

Cutro testified at length about the comparison process he uses. In this case, Cutro compared inked print cards containing the defendant's prints with the latent print found on the squad car. The exhibits were admitted into evidence. He uses the "analysis comparison evaluation and verification method." It consists of three levels. He does not use a points of comparison test.

In level one, Cutro looks at the flow or pattern type of fingerprint ridges. Then come the magnifying glass comparisons, "comparing the latent and going from the latent and looking at target individual characteristics or that level two and level three detail that I spoke about, and trying to find those ending ridges or bifurcations in sequence, and see if they match in sequence to the known standards." The individual characteristics at level two can be ending ridges, bifurcations, and dots. He uses level three if needed. Somewhere between the second and third levels he looks at the breadth or width of the ridges.

Cutro determines whether certain points of comparison are located in the same place. His notes reflect his conclusions, but not how he reached them. He identified the latent print as that of the defendant on two different occasions. Each time his conclusion was verified by other examiners.

I have no desire to denigrate the importance of cross-examination. However, I find no authority that supports the proposition that the lack of detail we find here is devastating enough to bar a qualified and experienced fingerprint examiner's opinions.

It is clear that the inability of an expert to remember the method he used to arrive at his opinion does not offend the confrontation clause of the sixth amendment. See *Delaware v. Fensterer*, 474 U.S. 15, 88 L. Ed. 2d 15, 106 S. Ct. 292 (1985) (hair comparison expert could

not recall the particular way he determined a hair had been forcibly removed).

In this State, two decisions address expert opinions that were admitted without supporting details. In *People v. Ford*, 239 Ill. App. 3d 314, 606 N.E.2d 690 (1992), a fingerprint examiner testified that the fingerprint lifted from a jewelry box belonging to the defendant. He did not testify to finding any particular number of like characteristics. He said it was not his practice to make notations of the number of ridged characteristics he found to correlate between a latent print and an exemplar. The court held the lack of numbers was a matter of weight and credibility for the fact finder.

The second decision dealt with a ballistics expert. In *People v. O'Neal*, 118 Ill. App. 2d 116, 254 N.E.2d 559 (1969), the expert testified to the procedure generally used to compare bullets and to the reasons why a comparison of bullets will reveal the identity of the gun which fired them. He told of test-firing the gun taken from the defendant and concluding the bullet that struck the robbery victim came from that gun. He did not testify to the particular similarities of the bullets. The court held the expert's opinion was properly admitted.

In this case it was made clear to the jury it was being asked to accept an opinion that was short of supporting details. Cross-examination on the point was vigorous. Obviously, that factual deficiency troubled the jury because it asked for a magnifying glass and had difficulty reaching a verdict. Still, this was a matter for the jury to decide and that is what it did.

I respectfully dissent.