# Illinois Official Reports

## Appellate Court

---

### *People v. Burhans*, 2016 IL App (3d) 140462

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JONATHAN BURHANS, Defendant-Appellant. |
| | |
| District & No. | Third District<br>Docket No. 3-14-0462 |
| | |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | June 29, 2016<br><br>July 27, 2016<br>July 27, 2016 |
| | |
| Decision Under Review | Appeal from the Circuit Court of Tazewell County, No. 13-CF-543; the Hon. Michael E. Brandt, Judge, presiding. |
| | |
| Judgment | Affirmed. |
| | |
| Counsel on Appeal | Michael J. Pelletier and Editha Rosario-Moore, both of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Stewart J. Umholtz, State's Attorney, of Pekin (Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | PRESIDING JUSTICE O'BRIEN delivered the judgment of the court, with opinion.<br>Justices Carter and Schmidt concurred in the judgment and opinion. |

¶ 1    Defendant, Jonathan Burhans, appeals his convictions of predatory criminal sexual assault of a child and aggravated criminal sexual abuse. Defendant argues that he is entitled to a new trial because the trial court improperly allowed expert testimony without the State first laying an adequate foundation for the witness's opinion. We affirm.

¶ 2                                FACTS

¶ 3    The State charged defendant with three counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)) and one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2012)).[1] The charges arose from defendant's conduct with his minor child, L.B.

¶ 4    The charges alleged that defendant committed predatory criminal sexual assault of a child by committing an act of sexual penetration with L.B. in that he knowingly made contact with her vagina with his penis, fingers, and tongue. The charges also alleged that defendant committed aggravated criminal sexual abuse by committing an act of sexual conduct with L.B. when defendant knowingly transferred semen into or onto L.B.'s mouth for the purpose of sexual gratification.

¶ 5    Prior to trial, the defense moved to exclude portions of nurse Maureen Hoffman's testimony. Hoffman conducted a physical examination of L.B. four days after L.B. reported the abuse. Hoffman's examination of L.B. was normal, and the report Hoffman prepared included a quote that "studies have shown that greater than 95 percent of exams following nonaccute disclosures (greater than 72 hours later) of abuse are normal."[2] The defense argued this testimony should be excluded because there was no indication of the basis for the statement or its source. The trial court reserved ruling for when Hoffman testified at trial.

¶ 6    At trial, L.B.'s mother, Jessica S., testified that on November 16, 2012, she lived in a house with defendant and L.B. Jessica is defendant's former wife. On that day, Jessica planned to cook dinner for a friend. Jessica left the house to purchase groceries for dinner while defendant and L.B. remained at the house. Jessica attempted to pay for the groceries with her and defendant's debit card but was unable to do so because the card had insufficient funds. Jessica returned home to confront defendant.

¶ 7    When Jessica returned home, she announced herself and attempted to locate defendant. Jessica approached her bedroom and attempted to open the door. However, defendant blocked the door from the inside. Jessica opened the door enough to observe L.B. on the bed buttoning her pants. Through the opening in the door, Jessica asked L.B. what had happened. L.B. pointed her finger at her "private area." Jessica asked L.B. a second time, and L.B. stated, "daddy went in me." Jessica then accessed the room and took L.B. into the bathroom.

¶ 8    Next, defendant entered the bathroom and denied L.B.'s allegations. Jessica then left the house with L.B. Jessica and L.B. returned to the home later that evening. That night, Jessica slept with L.B. in the child's bed. Jessica did not remove L.B.'s clothes or bathe her. Jessica

_____

[1]The State initially charged defendant with additional counts of predatory criminal sexual assault of a child and aggravated criminal sexual abuse but later dismissed those charges.

[2]Hoffman's report is not a part of the appellate record.

described the underwear that L.B. wore on November 16 and 17 and said L.B. only had one pair of underwear that matched the description.

¶ 9 The next morning (November 17), Jessica took L.B. to Pekin Hospital. At the hospital, Jessica informed nurse Deborah Taylor of L.B.'s allegations. Jessica told Taylor that L.B. had a tendency to lie and that L.B. had several problems including attention deficit hyperactive disorder (ADHD) and oppositional defiance disorder. Jessica testified that she told Taylor that L.B. had a tendency to lie because Jessica did not want to believe L.B.'s allegations were true. Jessica also told Taylor that L.B. may have seen a pornographic movie and may have made the allegations because she had watched the movie.

¶ 10 Taylor testified that during her examination, L.B. told her that defendant had pushed her down, pulled her pants down, and went "inside her." Taylor asked L.B. to show her on a doll where defendant had touched her. According to Taylor, L.B. touched the area between the doll's legs. Taylor also asked L.B. what defendant touched her with, and L.B. said "probably his fingers." Taylor collected a sexual assault kit from L.B., L.B.'s clothing, and her underwear and provided them to the police.

¶ 11 The State presented evidence that semen matching defendant's DNA profile was found in the crotch area of L.B.'s underwear. Defendant's DNA was not recovered from the sexual assault kit.

¶ 12 According to Jessica's testimony, she took L.B. to the Tazewell County Child Advocacy Center (child advocacy center) the next day (November 19). At the child advocacy center, Sarah Smith interviewed L.B. The video recording of the interview was presented to the jury.

¶ 13 During the interview, L.B. labeled an anatomical diagram of a human body. Initially, L.B. would not label the body parts because she did not want to get into trouble and said that defendant had been doing "bad things" to her. After Smith told L.B. that L.B. would not get into trouble, L.B. said that defendant had been "putting him in me" and that "his head been going in me." L.B. pointed on the picture to the area between the legs of the man and woman to illustrate what she meant.

¶ 14 When Smith asked L.B. how it felt when defendant went inside her, L.B. said it hurt. L.B. said that defendant told her to lie down and be quiet and pushed L.B. onto the bed. When asked if defendant touched her with any other parts of his body, L.B. stated "just the head." When asked again, L.B. said "he licks it there." Unlike her statement to Taylor, L.B. did not mention defendant touching her vagina with his fingers. When asked if L.B. ever saw anything come from defendant's penis, she said that defendant always made cream come out of it and that defendant "always wants it to go in my mouth" and that L.B. also said defendant used his fingers to put it in her mouth.

¶ 15 At the end of the interview, L.B. said that she had viewed a pornographic movie on the computer and that she had seen the movie with defendant. L.B. also stated that her brother and cousin had both put their "head" into her once.

¶ 16 Jessica testified that on November 20 (the day after taking L.B. to the child advocacy center), she took L.B. to the Pediatric Resource Center where L.B. was examined by Hoffman.

¶ 17 Hoffman testified that she was an advanced practice nurse in pediatric nursing with degrees in nursing and pediatric nursing. Hoffman also testified to the following credentials: she trained in advanced assessment diagnostics, took a 40-hour course on evaluating children and adolescents suspected of being victims of sexual abuse, attended conferences over the past

several years focusing on suspected child victims of sexual abuse or neglect, had an advanced practice certification in advanced forensic nursing and was involved with the creation of the national certification, held training called the "Pediatric Sexual Assault Nurse Examiner" training for an international certification in the acute case of children suspected to have been the victims of sexual abuse, and had seen 402 patients for suspected sexual abuse. The trial court accepted Hoffman as an expert in pediatric nursing, advanced forensic nursing, and in evaluating children of suspected sexual abuse.

¶ 18    Hoffman testified that she received information about L.B.'s disclosure of sexual abuse from Pekin Hospital and the child advocacy center before examining L.B. Hoffman conducted a full physical and anogenital exam, which revealed "normal" results. Although Hoffman found a hymenal mound in L.B., Hoffman testified that it was a normal variant. According to Hoffman, a normal finding is not unusual in the examination of sexual abuse. Hoffman said that she would not necessarily expect to find any clinical finding if a penis or fingers made contact with L.B.'s vagina because some time had passed since the incident. The defense objected for lack of foundation when Hoffman stated "numerous research studies" supported her opinion. The trial court overruled the objection.

¶ 19    Hoffman did not reference any research study by name or identify where the studies had been published but generally testified to research studies on the genitalia of children who had and had not disclosed sexual abuse, and she explained the studies concluded that a hymenal mound was a normal variance. Hoffman also referenced other studies that analyzed injury to the anogenital area and concluded that the area healed "very rapidly and often without any residual injury." Hoffman said that it was a common misperception to believe that following a disclosure of sexual abuse, a medical exam would reveal whether there had been penetration, but "very rarely" would an examiner be "able to tell if there [was] some type of residual injury that [was] still present." Hoffman explained that while many adults think penetration means going into the vagina, the medical definition entailed anything that went past the labia and not necessarily into the vagina. This was one reason Hoffman said that there often were not findings of injury caused to the child. Hoffman said she did not expect to make any clinical findings with L.B. because Hoffman's examination of L.B. was outside of the "72 hour window" when the "opportunity to find an abnormality on the exam [was] still very minimal."

¶ 20    On cross-examination, the defense asked Hoffman whether the studies that cited the 72-hour window concluded that "most of the time you are not going to find anything essentially." Hoffman answered, "95 percent of the time outside of 72 hours the exam is perfectly normal." The defense followed up by asking if there was a better opportunity to find something within the 72 hours, and Hoffman said that it was better but small, and "[a]bnormal exams are still only present, still less than 10 percent of the time."

¶ 21    Detective Chad Hazelwood testified that he investigated L.B.'s allegations. He spoke with defendant at the police station on November 21, 2012. Hazelwood spoke with defendant again on December 19. During the first interview, defendant acknowledged that he was alone in the bedroom with L.B. on the day of the incident. Defendant denied that he ever ejaculated in L.B.'s presence. The second interview was video recorded. The State played two excerpts of the recording at trial.

¶ 22    In the first video excerpt, defendant denied the allegations and explained that he did not open the door on the day of the incident because his pants had fallen down and he was trying to pull them up. In the second excerpt, Hazelwood asked defendant if he could see the pants

- 4 -

defendant wore on the day of the incident, but defendant said that Hazelwood could not because defendant disposed of the pants after they tore from overuse.

¶ 23 On cross-examination, the defense asked Hazelwood about the accusations L.B. made at the child advocacy center that her brother and cousin had abused her sexually. Hazelwood stated that L.B.'s brother and cousin had been interviewed but both investigations had concluded and no further investigation was needed.

¶ 24 At trial, L.B. was asked if she remembered a time when she was in defendant's bedroom. L.B. answered that "[h]e put his-self in me," and pointed to the area between her legs. L.B. said that she saw white "cream" come from defendant's "bad part" and that defendant put the "cream" in her mouth with his fingers. Later in L.B.'s testimony, she stated that defendant also touched her between her legs with his fingers and tongue.

¶ 25 On cross-examination, L.B. stated that she had seen pictures of people not wearing clothing one time when "super heroes change[d] their clothes." When asked if she had "ever seen people doing things to each other like you are saying happened to you from [defendant]," L.B. responded, "no."

¶ 26 Defendant testified on his own behalf. Defendant explained that the semen found on L.B.'s underwear could have been there on November 15 (the day before the abuse) when defendant was masturbating. Defendant said that when he finished masturbating he cleaned himself by using clothing he found nearby, which happened to be L.B.'s underwear.

¶ 27 Ultimately, the jury found defendant guilty of two counts of predatory criminal sexual assault (committing an act of sexual conduct with L.B. by touching her vagina with his penis and fingers) and one count of aggravated criminal sexual abuse (committing an act of sexual conduct with L.B. when defendant knowingly transferred semen into or onto her mouth). The jury acquitted defendant on one count of predatory criminal sexual assault of a child (committing an act of sexual conduct with L.B. by touching L.B.'s vagina with his tongue).

¶ 28                                                 ANALYSIS

¶ 29 On appeal, defendant argues that the trial court erred in allowing Hoffman to testify generally to research studies to support her conclusion that she would not necessarily expect to find any abnormalities in examining L.B. Stated differently, defendant contends the research studies cited by Hoffman were the basis for Hoffman's opinion, but the State failed to provide a foundation for the studies Hoffman relied upon in forming her opinion. While we find the State failed to lay an adequate foundation for Hoffman's references to research studies, we find the error harmless beyond a reasonable doubt.

¶ 30 " '[T]he admission of an expert's testimony requires the proponent to lay an adequate foundation establishing that the information upon which the expert bases his opinion is reliable.' " *People v. Safford*, 392 Ill. App. 3d 212, 221 (2009) (quoting *Hiscott v. Peters*, 324 Ill. App. 3d 114, 122 (2001)); Ill. R. Evid. 703 (eff. Jan. 1, 2011). " 'To lay an adequate foundation for expert testimony, it must be shown that the facts or data relied upon by the expert are of a type reasonably relied upon by [experts] in that particular field in forming opinions or inferences.' " *People v. Smith*, 2012 IL App (1st) 102354, ¶ 70 (quoting *People v. Contreras*, 246 Ill. App. 3d 502, 510 (1993)); Ill. R. Evid. 703 (eff. Jan. 1, 2011). It is the function of the trial court to determine whether the foundational requirements are met, which we review *de novo*. *Safford*, 392 Ill. App. 3d at 221.

¶ 31    In this case, Hoffman testified that she made a normal finding based on her physical examination of L.B. Hoffman then explained that she would "not necessarily" expect to find any clinical findings if a penis or fingers had made contact with L.B.'s vagina. Hoffman went on to testify that "numerous research studies" supported her opinion, but the State never laid an adequate foundation for the studies cited by Hoffman. Experts may premise their testimony on information and opinions obtained from the reading of standard publications on which their opinions are based. *People v. Bradney*, 170 Ill. App. 3d 839, 862 (1988). However, while an expert does not have to name the publication upon which she relied, the expert must show that the general consensus of the medical and forensic community recognizes the study upon which the expert relies. *People v. Lopez*, 228 Ill. App. 3d 1061, 1074 (1992). Because Hoffman neither identified any publication nor testified that the general consensus of the medical and forensic science community recognize the studies she cited, we hold the trial court erred in overruling the defense's objection to Hoffman's references to the conclusions of unidentified research studies.

¶ 32    Having found error, which defendant preserved for review, we must now consider whether the error is harmless. Under harmless error analysis, "the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error." *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). An evidentiary error is harmless if the other properly admitted evidence is overwhelming. *People v. Carlson*, 92 Ill. 2d 440, 449 (1982). Upon review, we find the error harmless beyond a reasonable doubt because even without Hoffman's opinion testimony, the remaining admissible evidence overwhelmingly supports defendant's convictions. *People v. Lindgren*, 79 Ill. 2d 129, 141 (1980).

¶ 33    In the present case, L.B. testified at trial that defendant penetrated her vagina with his penis. L.B. also testified that she observed "white cream" come from defendant's "bad part" which defendant put into her mouth with his fingers. L.B. then testified that defendant also touched her vagina with his fingers. Further, forensic evidence conclusively identified the presence of defendant's semen in L.B.'s underwear, which Jessica identified as the same underwear worn by L.B. on the day of the abuse. L.B.'s testimony along with the physical evidence strongly support the jury's finding of guilt.

¶ 34    Moreover, defendant testified at trial and provided an unbelievable explanation for the presence of his semen in L.B.'s underwear. That is, defendant claimed that his semen was found in L.B.'s underwear because he had masturbated the day before the incident and used L.B.'s underwear to clean himself. "If a defendant chooses to give an explanation for his incriminating situation, he should provide a reasonable story or be judged by its improbabilities." *People v. Hart*, 214 Ill. 2d 490, 520 (2005). Equally unbelievable is the explanation defendant provided to Hazelwood that he blocked Jessica from opening the bedroom door because his pants fell down when Jessica entered the house.

¶ 35    Defendant challenges the strength of the evidence by arguing that the evidence suggests L.B. may have fabricated her allegations. Specifically, defendant claims he did not abuse L.B. and that L.B. made her allegations against him because L.B. was acting out what she may have seen in a pornographic movie. Defendant also notes that there is evidence that L.B. suffered from ADHD and oppositional defiant disorder. Defendant contends that this conclusion is supported by the discrepancies in L.B.'s allegations, such as: (1) L.B. did not tell Jessica that defendant used his fingers to touch her, but she made the statement to Taylor at Pekin Hospital; (2) L.B. did not say that defendant touched her with his tongue or put semen in her mouth until

she spoke with Smith at the child advocacy center; (3) L.B. testified at trial that defendant touched her with his penis and only stated defendant touched her with his fingers and tongue after prompting from the State; and (4) L.B. alleged that her brother and cousin both engaged in sexual conduct with her, but Hazelwood testified that he investigated those claims and concluded that no further investigation was needed.

¶ 36    However, none of the above facts cited by defendant demonstrate that L.B. fabricated her allegations against defendant. L.B. consistently alleged defendant abused her by touching her vagina with his penis. This allegation is supported by the DNA evidence. While L.B. did not initially report that defendant touched her vagina with his fingers or put his semen in her mouth, L.B. never denied that defendant performed either act. Further, the fact that the police chose not to investigate any further into L.B.'s allegations against her brother and cousin neither establishes her allegations were untrue nor provides a reason for L.B. to fabricate her allegations against defendant.

¶ 37    Finally, we reject defendant's argument that the admission of Hoffman's testimony contributed to his convictions because the jury demonstrated it had doubts as to whether defendant committed an act of sexual conduct with his tongue by acquitting him of that charge. According to defendant, any doubts as to whether defendant committed an act of sexual conduct by penetrating L.B.'s vagina with his penis or fingers were resolved due to Hoffman's improperly admitted testimony. In addition, defendant contends that Hoffman's testimony bolstered L.B.'s credibility. We disagree. Hoffman's testimony neither resolved the question of whether defendant touched L.B.'s vagina with his penis or fingers nor bolstered L.B.'s credibility. Rather, Hoffman's testimony merely served to show potential reasons why L.B. did not display physical abnormalities several days after the abuse. In short, Hoffman's testimony did not show that defendant had committed the alleged crimes. It was L.B.'s testimony, along with DNA evidence, that overwhelmingly supported defendant's convictions. Thus, the improper admission of Hoffman's testimony is harmless error.

¶ 38                                            CONCLUSION
¶ 39    The judgment of the circuit court of Tazewell County is affirmed.

¶ 40    Affirmed.