2020 IL App (1st) 172789-U
Order filed: March 13, 2020

FIRST DISTRICT
FIFTH DIVISION

No. 1-17-2789

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 12 CR 9164-01 |
| | ) | |
| DEVELL JOHNSON, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Hoffman and Justice Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirmed defendant's conviction of first degree murder, finding that the State proved him guilty beyond a reasonable doubt and that the trial court committed no error by admitting the testimony of the State's expert witness regarding the timing of the victim's injuries. We also found that the trial court did not err by admitting the defendant's confession during the State's rebuttal case, and that the State's comments during closing argument did not deprive him of a fair trial.

¶ 2    A jury convicted defendant, Devell Johnson, of the first degree murder of the two-year-old

victim, Armaney Cotton, and the trial court sentenced him to 30 years' imprisonment. On appeal,

defendant contends: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial

court erred by admitting certain impeachment evidence; (3) the trial court erred by admitting the State's rebuttal evidence that defendant had confessed to beating Armaney; (4) the trial court erred by admitting certain testimony of the State's expert witness that was made without an evidentiary basis; and (5) the State made improper remarks during closing arguments. We affirm.

¶ 3     Prior to trial, defendant filed a motion to suppress his statements to Detective Martin, in which he confessed to striking Armaney. The trial court denied the motion.

¶ 4     At trial, Armaney's mother, Brittany Cotton, testified that in April 2012, she worked as a housekeeper at the Park Hyatt Hotel in Chicago. Brittany and Armaney lived in an apartment with Brittany's mother, Denise Cotton, who worked at the same hotel.

¶ 5     On April 13, 2012, Brittany asked defendant, her boyfriend of two years, if he would babysit Armaney the next day while she and Denise were at work. Defendant agreed. On the evening of April 13, Armaney took a bath, had a bowl of ravioli, and watched television, then fell asleep in Brittany's bed. Brittany slept in the bed with her.

¶ 6     The next morning, on April 14, Brittany dressed Armaney. Armaney had no bruises or bite marks on her body when Brittany dressed her.

¶ 7     Defendant picked up Brittany and Armaney at 7 a.m. and drove them to his house, which was a single-family home with a main floor and a basement. Defendant's mother and stepfather had a bedroom on the first floor of the house; defendant's bedroom was in the basement. When they arrived, Brittany saw one of defendant's brothers and "a little boy in the front room playing a video game."

¶ 8     Brittany, Armaney, and defendant went to defendant's bedroom in the basement. Brittany left at about 8 a.m. to catch a bus to take her to work. When Brittany left, Armaney was sitting on

defendant's bed, eating a snack and watching television. Armaney did not have any visible injuries and voiced no complaints about any "hurts."

¶ 9     After arriving at work, Brittany called defendant to check on Armaney and he said that she was "fine." Brittany called defendant again at about 2 p.m. and he again said that Armaney was "fine." Brittany asked to speak with Armaney. Defendant said that Armaney was "not feeling good" and that she did not feel like talking on the phone.

¶ 10     When Brittany's shift ended at 5:30 p.m., she checked her phone and discovered that defendant had left three or four voice mails for her. His first message said, "Call me. Armaney is in the hospital." Brittany called defendant back and asked him why Armaney was in the hospital. Defendant told her that he thought he "gave her too much medication and she's not responding, so she's at the hospital."

¶ 11     Brittany hung up and told her mother, Denise, that Armaney was in the hospital. Denise called defendant and heard someone in the "background" say that Armaney was at St. Bernard Hospital. Brittany and Denise went to the hospital and learned that Armaney was dead. Brittany "blanked out after that."

¶ 12     Denise Cotton testified that before she left for work on April 14, 2012, Armaney came to her bedroom door, waved, and said "bye, bye." Armaney seemed happy and had no visible injuries on her face or body. After Brittany and Armaney left to go to defendant's house, Denise took the bus to work.

¶ 13     Denise and Brittany took a lunch break at around 1:30 p.m., at which time Brittany called defendant and put him on speaker phone so that Denise could hear too. Brittany asked defendant about Armaney, and defendant replied that "she was sleep or something, and she *** wouldn't

wake up or respond." Defendant indicated that Armaney was too tired to talk with Brittany and that she was also "acting funny." Denise did not hear Armaney say anything during the phone call.

¶ 14     At about 5 p.m., Denise was finishing work and putting away her cleaning supplies when Brittany came over to her. Brittany was very upset and said that defendant told her something was "wrong" with Armaney, that she "wasn't responding." They went into their manager's office, and Denise called defendant and asked him what was wrong with Armaney. Defendant replied that he had been in the shower, and when he came out, Armaney "wasn't responding," that "she won't wake up."

¶ 15     Denise asked defendant if he had called an ambulance, and he said that he had not called for one but that "someone did." Defendant did not know the name of the hospital that Armaney had been taken to, but "someone in the background" said that Armaney had been taken to St. Bernard Hospital.

¶ 16     Brittany and Denise took the train to St. Bernard Hospital, where they saw detectives who told them that Armaney was dead. Brittaney screamed and hollered and then passed out on the floor.

¶ 17     Defendant's stepfather, Robert Harrison, testified that two of his stepsons, defendant and Devonte Parker, and his grandson Donrell Radcliffe, were at his home on April 14, 2012. At about 3 p.m., Robert and his wife, Fannie, went to the grocery store. Defendant called Robert while they were at the store and told him that Armaney was at the house and that she "might have fell" 10 or 15 minutes earlier and that "she wasn't responsive." Robert told defendant to take Armaney upstairs and open the front door; Robert then called 911. Robert testified that he was not even aware Armaney was at his house until he received defendant's phone call.

¶ 18     Donrell Radcliffe, Robert's grandson, testified that on April 14, 2012, he was 12 years old and was visiting his grandparents at their house. Donrell was playing video games in the front room on the first floor. Donrell's uncle, Devonte, was also on the first floor; defendant was in the basement.

¶ 19     At some point, defendant brought Armaney upstairs from the basement and placed her on the couch in the front room. Devonte then took Donrell into his grandparents' bedroom and closed the door. Donrell did not have any interaction with Armaney that day. Donrell did not see defendant hurt or whip Armaney, and he did not hear defendant scream at her.

¶ 20     Devonte Parker, defendant's brother, testified that he lived with his mother, Fannie Thomas, his stepfather, Robert Harrison, defendant, and another brother. On April 14, 2012, Devonte was 19 years old and he was home with defendant and his nephew, Donrell, who was visiting. Devonte was working on a laptop computer at the dining room table, Donrell was playing video games in the living room, and defendant was in the basement.

¶ 21     Devonte first learned that Armaney was in the house when defendant carried her upstairs to give her a bath. Defendant told Devonte that Armaney was "sick" and "didn't feel good." Devonte could not see Armaney's face while defendant was carrying her.

¶ 22     Defendant later said that Armaney was "unresponsive." Devonte immediately took their nephew, Donrell, into his mother's room and closed the door because he did not want Donrell to see Armaney in an unresponsive state. Defendant then laid Armaney on the couch, with her back to them; Devonte did not get a look at her face. Defendant was "panicking" and told Devonte not to touch her, and that an ambulance was on its way.

¶ 23    Officer Mark Campbell testified that at about 4 p.m. on April 14, 2012, he and his partner responded to defendant's residence to "assist EMS [with an] unresponsive child." When they arrived, paramedics were already performing CPR on Armaney in an ambulance.

¶ 24    Officer Campbell spoke with defendant, who stated that he had been babysitting Armaney, and that she had hit her head on a side table attached to a bed. Defendant gave Armaney some Tylenol and laid her down on the bed. When he later tried to wake her up to feed her, she was unresponsive. Defendant called his stepfather, who in turn called 911.

¶ 25    Paramedics took Armaney to St. Bernard Hospital, and Officer Campbell followed. When Brittany arrived at the hospital and learned that Armaney was dead, she began screaming, fell on the floor, and could not be consoled.

¶ 26    Patrick O'Connell testified that on April 14, 2012, he was working as an ambulance commander for the Chicago Fire Department when he received a call at around 4:09 p.m. to respond to a residence to assist an "unconscious breathing" victim. When he entered the house, O'Connell saw Armaney laying on the couch; she did not appear to be breathing and she had no pulse.

¶ 27    O'Connell picked Armaney up and carried her to the ambulance. She was "moist and she was very cool, like she was laying there for some time." In the ambulance, O'Connell and his partner inserted a breathing tube in Armaney's airway, performed CPR on her, and "start[ed] an IV."

¶ 28    O'Connell observed bruises on one side of Armaney's face, and on one of her shoulders. O'Connell's partner observed a bite mark on her buttocks. O'Connell testified that Armaney's body "did not look normal"; her chest cavity was swollen, her coloring was ashen, her eyes were

open and fixed. O'Connell and his partner continued their efforts to revive Armaney on the way to the hospital, but she "never had *** a pulse or respirations."

¶ 29    Patrick Doyle, an evidence technician with the Chicago Police Department, testified that Armaney had a bite mark on the back of her right hip.

¶ 30    Dr. Laura Musyoka, the resident physician who treated Armaney at St. Bernard's Hospital, testified that Armaney had multiple bruises on her face, neck, and chest. Armaney also had a circular bruise on her "right low back flank area" that appeared to have "teeth marks around the edge" and that she suspected to be a bite mark. The bruises were all a reddish-purple color and looked relatively new.

¶ 31    Dr. Musyoka and other medical staff continued CPR and administered epinephrine, sodium bicarbonate, and IV fluids to Armaney, but none of the treatments caused any change in her condition and she was pronounced dead at 4:42 p.m. Armaney had been without a heartbeat for about 30 minutes and was "cold to touch," with a body temperature of 94.4 degrees, which is considerably lower than the normal body temperature of 98.6 degrees. Dr. Musyoka explained that a low body temperature indicates that the person has "actually been deceased for awhile."

¶ 32    Dr. Jeffrey Bzdusek testified that he was the attending emergency medicine physician at St. Bernard's Hospital on April 14, 2012, when Armaney was brought in at 4:28 p.m. Armaney was in cardiopulmonary arrest, meaning that her heart was not beating. She was not breathing, she was cool to touch, and she had "bruises over her body." Dr. Bzdusek testified consistently with Dr. Musyoka regarding the treatment administered to Armaney and her time of death.

¶ 33    Dr. Adrienne Segovia testified that she is an assistant medical examiner who performed an autopsy on Armaney. Dr. Segovia's external examination revealed that Armaney was 37.5 inches tall and weighed 36 pounds. Armaney had sustained numerous recent injuries, including: multiple

bruises on her face, including bruises on and behind her left ear, left eyebrow, and right eye, some of which were consistent with finger marks; abrasions consistent with fingernail marks on her left eyebrow and the left side of her face; abrasions behind her ear, on the cheek, along the corner of her right eye, on the lower left side of her abdomen, on the right side of her chest, and on the middle and right side of her back; punctate hemorrhages in both eyes; a patterned bruise on the right side of her head "most likely associated with some kind of object"; bruises on the center of her chest consistent with CPR compressions; bruises on the right side of her chest, beneath her collarbone on the left side, and on her left shoulder and right arm; and a patterned injury on the right side of her lower back consisting of "an area of circular bruising with abrasions or scrape marks in it" that "looked like a bite mark."

¶ 34    Dr. Segovia's internal examination revealed additional injuries to Armaney's organs, including bruises to her small intestine, a subdural hematoma on the left side of her brain and swelling of the brain itself, and four tears on the right side of her liver. The tears to her liver resulted in a quick rate of blood loss into the abdomen in the areas around the kidneys and small intestine and was "a fatal injury in and of itself." Dr. Segovia specifically noted the pale color of Armaney's kidneys, which was indicative of blood loss from the liver. Armaney would have survived "[ma]aybe a couple of hours" after the injury to her liver.

¶ 35    Dr. Segovia testified that all of Armaney's injuries were caused by blunt force trauma, that Armaney died from "multiple injuries due to a beating," and that the manner of death was homicide.

¶ 36    On cross-examination, Dr. Segovia testified that the liver is surrounded, or encapsulated, by a membrane and that it is theoretically possible for the liver to be torn while the membrane remains intact, in which case the blood from the torn liver would remain pooled around the liver,

within the membrane. Such an injury is called a subcapsular hematoma. When a person suffers a subcapsular hematoma, blood loss would be slower than if the membrane had also been cut, and the person would likely live longer than a person whose liver *and* surrounding membrane had been torn. Dr. Segovia saw such a subcapsular hematoma on the back of Armaney's liver, on the right side. The four lacerations to the front of Armaney's liver were not indicative of a subcapsular hematoma, though, because the lacerations were accompanied by a torn membrane. Dr. Segovia reiterated on recross-examination that Armaney would have lived no more than two hours after sustaining the four lacerations to the front of the liver, with the accompanying rapid blood loss.

¶ 37    Dr. Michael Baden testified for the defense as an expert in forensic pathology. Dr. Baden testified that some of Armaney's external injuries, such as the abrasions on her left jawline and below the left ear, and the hemorrhages in her eyes, could have been caused by the CPR and other resuscitation attempts. Vigorous performance of chest compressions during the administration of CPR can also cause liver lacerations and can exacerbate a preexisting liver laceration.

¶ 38    Dr. Baden conceded that Dr. Segovia's estimate that the blood loss from Armaney's four liver lacerations would have resulted in her death within two hours was "reasonable," assuming that the membrane around the liver was also lacerated at the same time. However, if the injuries to Armaney's liver were indicative of a subcapsular hematoma, the blood loss would have been much slower, and Armaney might have survived for 24 hours after the injury. Dr. Baden opined that Armaney's four lacerations to the liver were "likely" indicative of a subcapsular hematoma, meaning that Armaney's injuries could have been caused up to 24 hours *before* her death and several hours before she was brought to defendant's house.

¶ 39    Dr. Baden testified that internal bleeding can manifest itself in grogginess and sleepiness, such as exhibited by Armaney at defendant's house before her death, and that her injuries could

have been caused the night before her arrival at defendant's house. On cross-examination, Dr. Baden stated that he had reviewed police reports and that his opinion was based on defendant's statement to police about Armaney appearing sickly. When asked if he had reviewed defendant's interview with Detective Martin, Dr. Baden asked to review his notes and a sidebar was held. The court stated, "There's been a question at sidebar about the scope of cross-examination, which we will spread of record outside the presence of the jury later, but you may *** continue your cross-examination." The State subsequently asked Dr. Baden whether he had viewed the videotape of defendant's statement to Detective Martin. Dr. Baden stated that he had not watched the videotaped interview, but had "read through the interview." The State asked Dr. Baden to more fully explain "what exactly it was" that he reviewed, and Dr. Baden stated:

> "I have here all my records on the case, and *** the format was a CD with the autopsy photos and the postmortem report and police reports. Some of it was on CD, but I have all the paperwork I received, which is also the autopsy report and police reports and medical intervention records."

¶ 40 Dr. Baden stated that he did not "recall getting a video statement of the defendant."

¶ 41 The State then asked Dr. Baden a hypothetical question about whether his timeline of Armaney's injuries would change if defendant had admitted to police that he "whooped" Armaney and hit her on her back to make her go to sleep. Dr. Baden responded that he had "not read that part of" defendant's statement to Detective Martin, but that if Detective Martin is "telling the truth" about defendant's admission, "that's bad." Dr. Baden also testified:

> "I'm not there to determine who's telling the truth, whether the detective is telling the truth or whether the defendant is telling the truth. But, sure, if they contradict each other, they contradict each other."

¶ 42    The defense rested at the conclusion of Dr. Baden's cross-examination. After the jury left the courtroom, the court stated to the parties:

"[THE COURT]: Let me talk about the sidebar. The defense was concerned when the State's Attorney wanted to cross-examine the witness, Dr. Baden, about statements that defendant may have made while he was being interrogated by the police. There had been a motion to suppress statements heard in this courtroom and that had been denied.

Apparently, what we talked about at sidebar was that the doctor did indicate on his reports, and I didn't get the reports, but both sides agree there are reports and he referenced in the reports that he considered as part of his expert opinion statements made by the defendant. It turns out that the statements that [Dr Baden] got, and I'm not faulting the defense counsel, but he may not have had and considered complete statements that were tendered. Defense counsel apparently did tender full statements, but he didn't look at all of it. He looked at some of it, basically what's in the police reports.

I am also told by both sides that, and they both agree, that during the course of the interrogation at some point, the defendant admitted that he [whooped] the child and that he bit the child. *** The State's Attorney has full right to tell the jury the truth and explore that completely. I will note these are admissions against self-interest. ***[The State has] a right to perfect the impeachment. *** I would ask the parties to talk to each other and see if there is some way you can agree on perfecting the impeachment. If not we [will play the videotape of defendant's statement to the detectives]."

¶ 43    The court then attended to some other matters on its call, after which the following proceedings occurred:

"[THE COURT]: Bring back Devell Johnson. Come on up. We're going to talk about this issue, spread it all of record. *** Here's our situation: the defense has rested. They called Dr. Baden as their witness. Dr. Baden apparently made a report, and he indicated in his report that he considered statements that were made by the defendant. *** Apparently, there were more statements that were made by the defendant [to the detectives] that were fully known to everybody during the course of discovery that were tendered to the doctor that he did not consider ***. The jury has the right to know the truth. ***.

The State's Attorney wants the jury to know that the doctor didn't know about these other things apparently that nobody disputes that [defendant] said during the course of his interrogation, and that is that he bit the child and that he [whooped] the child, so I believe that's fair game. The defense has objected to that, and *** has suggested that the State's Attorney asking the question, would it change your opinion if you knew that he had said these things and the doctor said, well, yeah, that could change his opinion, [defendant] thinks that's all the impeachment they need.

Respectfully, I totally disagree. All that does is lay foundation for the impeachment. It doesn't show that he actually did make the statements, and they're entitled to put that in evidence to show that that's actually true that there is evidence out there that the doctor didn't consider in the body of information he had when he *** rendered his opinions."

¶ 44    Defense counsel argued that defendant's statement to the detectives should not be admitted as substantive evidence. The trial court disagreed, stating:

"[THE COURT]: They could always put it in as substantive evidence because these are admissions against self-interest, admissions against penal interest ***. It's totally admissible, and there is no problem with the jury considering it as substantive evidence.

But it is absolutely impeachment, and the jury has the right to know that [Dr. Baden] didn't have full information when he rendered his opinion. He is an expert. He has all these credentials. He got all the materials. *** He considered part of it, not all of it.***

This is a classic case of the door being opened. The only way this would have happened is if he said that he didn't—he never saw the materials. Even though they were tendered to him, he didn't look at them. If he had said, yeah, I looked at the materials, it doesn't change my opinion, then we're done. But he said he never even looked at them, so [the State has] a right to [perfect] the impeachment to show what he omitted."

¶ 45    During its rebuttal case, the State introduced the parties' stipulation that on April 15, 2012, defendant told Detective Martin that he "whooped" Armaney and gave her a "smack" on her head and buttocks on April 14, 2012, because she refused to go to sleep and kept moving around.

¶ 46    In surrebuttal, defendant introduced the parties' stipulation that Dr. Baden would testify that "after having heard that set of facts or that stipulation, that his statement, his opinion, would not change at all."

¶ 47    The jury convicted defendant of Armaney's murder, and the trial court sentenced him to 30 years' imprisonment. Defendant appeals.

¶ 48    First, defendant contends that the State failed to prove him guilty beyond a reasonable doubt. When faced with a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements of the crime beyond a reasonable doubt. *People v. Newton*, 2018 IL 122958, ¶24. The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and the reviewing court will not substitute its judgment for the trier of fact on these matters. *People v.*

*Brooks*, 187 Ill. 2d 91, 131 (1999). A criminal conviction will be reversed only if the evidence is so improbable or unsatisfactory that there is a reasonable doubt of defendant's guilt. *People v. Givens*, 237 Ill. 2d 311, 334 (2010).

¶ 49    After examining the evidence in the light most favorable to the State, we conclude that any rational trier of fact could have found that defendant committed the first degree murder of Armaney. Armaney's mother and grandmother, Brittany and Denise, testified that prior to dropping Armaney off at defendant's house in the morning on April 14, 2012, she was in good health with no visible injuries to her body. Defendant's brother and nephew were in the house, but they each testified to having no contact with Armaney prior to defendant carrying her to the couch in the afternoon. After paramedics responded to the 911 call from defendant's stepfather at about 4:09 p.m., they observed bruising on Armaney's face and body, a bite mark on her buttocks, a swollen chest cavity, and ashen coloring. She was not breathing. The paramedics attempted to revive Armaney using CPR but were unsuccessful. The medical staff at the hospital continued CPR and other treatments, but they were not successful and Armaney was pronounced dead at 4:42 p.m. Armaney was cold to the touch, meaning that she was dead prior to 4:42 p.m.

¶ 50    Dr. Segovia performed the autopsy on Armaney and discovered numerous external and internal injuries, including bruising on her face, body, and small intestines, a subdural hematoma on the left side of her brain, swelling of the brain, and four tears on the right side of her liver, resulting in rapid blood loss and death. According to Dr. Segovia, Armaney would have survived no more than two hours after suffering the injury to her liver, meaning that she was in defendant's care at the time of her injury. Dr. Segovia concluded all of Armaney's injuries were caused by blunt force trauma, and that the manner of death was homicide.

¶ 51    Throughout the course of the day on April 14, 2012, defendant gave conflicting accounts of Armaney's health and the cause of her injuries. When Brittany called him at 2 p.m. to check on Armaney, he first told her that Armaney was "fine," but after Brittany asked to speak with Armaney and she did not say anything, defendant said that Armaney was "not feeling good" and did not feel like talking on the phone. At about 3 p.m., defendant called his stepfather Robert and told him that Armaney "might have fell" and that "she wasn't responsive." When Officer Campbell arrived at defendant's residence at about 4 p.m., defendant told him that Armaney had hit her head on a side table attached to a bed and was no longer responsive. At about 5:30 p.m., defendant spoke with Brittany on the phone and told her that Armaney was in the hospital because she was not "responding," as he had given her "too much medication."

¶ 52    Defendant subsequently admitted to Detective Martin that he had given Armaney a "whooping," and "smack[ed]" her on the buttocks and back, because she refused to go to sleep.

¶ 53    This evidence, viewed in the light most favorable to the prosecution, was not so unsatisfactory as to raise a reasonable doubt of defendant's guilt.

¶ 54    Defendant argues, though, that a reasonable doubt of his guilt was raised by Dr. Baden's testimony that the four lacerations to the front of Armaney's liver were likely indicative of a subcapsular hematoma, meaning that her injuries could have been caused up to 24 hours before her death, while she was still in Brittany and Denise's care. However, Dr. Segovia testified to the contrary that the four lacerations on the front of Armaney's liver were not indicative of a subcapsular hematoma because the lacerations were accompanied by a torn membrane, meaning that the blood loss was rapid and that the injuries were caused no more than two hours prior to her death, while she was in defendant's care. The jury resolved the conflict in the testimony in favor

of Dr. Segovia and convicted defendant; we will not substitute our judgment therefor. *Brooks*, 187 Ill. 2d at 131.

¶ 55    Defendant argues that Dr. Segovia's testimony regarding the timeline of Armaney's injuries was incredible, because she gave conflicting testimony of how long Armaney could have lived after the liver lacerations; defendant contends that Dr. Segovia first stated that Armaney could have lived 10 hours after the injuries to her liver (meaning that the injuries could have occurred while Armaney was in Brittany and Denise's care), but later testified that she would have lived no more than two hours after those injuries. Given the "shifting timeline" of Armaney's injuries as testified to by Dr. Segovia, defendant contends a reasonable doubt of his guilt was raised.

¶ 56    Defendant's contention is without merit. On direct examination, Dr. Segovia testified that Armaney would have survived "maybe a couple of hours" after her liver injury. On redirect examination, Dr. Segovia was asked whether it was possible for Armaney to have survived for 10 hours after her liver injury, and she testified, "No." On recross-examination, Dr. Segovia testified as follows:

"Q. So you got down to 10 hours in terms of the amount of time that someone could survive. Can you tell us how many hours someone could survive with these injuries being the size of this child?

A. I can give my opinion on that.

Q. Well, 10 hours is your opinion, correct?

A. No, less than 10.

Q. But your answer of 10 hours, that was your opinion as well, correct?

[ASSISTANT STATE'S ATTORNEY]: Objection.

[THE COURT]: Objection sustained. That's not what she said. Try it again. Ask a question. You want to give her, her opinion—ask her opinion, she'll give it to you.

Q. What is your opinion of how long?

A. The absolute maximum would be two hours."

¶ 57 Thus, contrary to defendant's argument on appeal, Dr. Segovia's opinion regarding the timing of Armaney's injuries never wavered; she consistently testified that Armaney suffered her injuries no more than two hours prior to her death, while she was in defendant's care. Viewed in the light most favorable to the State, Dr. Segovia's testimony, coupled with the testimony of the other prosecution witnesses described earlier in this order, was such that any rational trier of fact could have convicted defendant of Armaney's first degree murder beyond a reasonable doubt.

¶ 58 Next, defendant contends that the trial court erred by allowing the State to cross-examine Dr. Baden regarding whether his opinion that Armaney's injuries likely occurred before she went to defendant's house would have changed if defendant stated to Detective Martin that he whooped Armaney and hit her on her back to make her go to bed. Defendant also contends that the court erred during the State's rebuttal case by allowing the State to perfect its impeachment of Dr. Baden by admitting the stipulation of defendant's statement to Detective Martin. Defendant argues that such impeaching evidence was inadmissible where Dr. Baden never relied on defendant's statement to Detective Martin when formulating his opinion regarding the timing of Armaney's injuries.

¶ 59 "The admission of evidence and the scope of cross-examination of expert witnesses rests within the sound discretion of the trial court, whose rulings will not be disturbed absent an abuse of that discretion." *Fragogiannis v. Sisters of St. Francis Health Services, Inc.*, 2015 IL App (1st) 141788, ¶ 27. An expert may express an opinion based on facts that are not in evidence, if those

facts are of a type reasonably relied upon by experts in the particular field. Ill. R. Evid. 703 (eff. Jan. 1, 2011). On cross-examination, an expert may be questioned with respect to material that he reviewed but upon which he did not rely. *People v. Pasch*, 152 Ill. 2d 133, 179 (1992).

¶ 60     In conducting the cross-examination, counsel may test the expert's opinion by asking if other facts, data, or opinions would alter his opinion. *Jager v. Libretti*, 273 Ill. App. 3d 960, 966 (1995). "Essentially, an expert may be cross-examined with respect to reports he did not review and did not rely upon, if those reports are truly used as tools of impeachment, rather than as a Trojan Horse used to slip hearsay evidence into the trial." *Id.*

¶ 61     Additionally:

> "Counsel has a right to ask an expert witness a hypothetical question that assumes facts that counsel perceives to be shown by the evidence. [Citation.] The assumptions contained in the hypothetical question must be based on direct or circumstantial evidence, or reasonable inferences therefrom. [Citation.] The hypothetical question should incorporate only the elements favoring his or her theory, and should state facts that the interrogating party claims have been proved and for which there is support in the evidence. On cross-examination, the opposing party may substitute in the hypothetical those facts in evidence that conform with the opposing party's theory of the case." *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 96 (1995).

¶ 62     The trial court has the discretion to allow a hypothetical question of an expert, although the supporting evidence has not yet been adduced, as long as the supporting evidence is produced and connected later. The evidence will be excluded upon the examining party's failure to produce the evidence and establish the connection. *Id.*

¶ 63    In the present case, the State properly cross-examined Dr. Baden by asking him to hypothetically consider whether his opinions would change, "if [defendant's] description to the detective was that he whooped [Armaney], he hit her on her back and he whooped her to make her go to sleep"; and "if the defendant described to the detectives a child that refused to stay in the bed when he wanted her to stay in the bed and was trying to climb the stairs and was being active when he wanted her to sleep." The court allowed the hypothetical question subject to the State adducing the supporting evidence. The court was aware and the parties agreed that the supporting evidence existed in the form of defendant's videotaped interview with Detective Martin.

¶ 64    The trial court subsequently allowed the State to introduce the parties' stipulation of defendant's statement to Detective Martin, thereby "connecting up" the State's hypothetical question of Dr. Baden with the supporting evidence. We find no abuse of discretion.

¶ 65    Also, if we were to view the State's cross-examination of Dr. Baden as impeachment as to material that he reviewed but did not rely on, or of reports he did not review and did not rely upon, the trial court's subsequent admission of the parties' stipulation of defendant's statement to Detective Martin was proper as Dr. Baden never admitted the impeaching fact that defendant had confessed to Detective Martin that he whooped Armaney and hit her on her back to make her go to sleep. See *People v. Anderson*, 2018 IL App (1st) 150931, ¶ 24 (Where a party attempts to impeach a witness and the witness does not admit the impeaching fact, or otherwise equivocates, the examining party must perfect the impeachment by offering evidence of the impeaching fact.).

¶ 66    Defendant argues that *Rios v. City of Chicago*, 331 Ill. App. 3d 763 (2002), compels a different result. In *Rios*, plaintiff brought suit against the City of Chicago (the City) after sustaining injuries when she allegedly slipped and fell on an unnatural accumulation of ice on an "alley return"—a concrete surface spanning the entrance to an alley—located in Chicago. *Id*. at 765-66.

Donna Seltin testified in a discovery deposition that she was walking about one block behind plaintiff on the morning of her fall, and that there was a natural accumulation of ice all over the ground and it was actively sleeting. *Id.* at 770. Prior to trial, Ms. Seltin died. *Id.* Plaintiff filed a motion *in limine* to bar the City from introducing Ms. Seltin's deposition testimony at trial for any purpose. *Id.* The trial court found that the deposition testimony was inadmissible as substantive evidence, but it was allowable for the purpose of explaining the basis of the City's expert's opinion and to impeach plaintiff's expert. *Id.*

¶ 67    At trial, plaintiff's structural engineering expert, Harold Miller, testified that the condition of the concrete led to the development of an unnatural accumulation of ice. *Id.* at 766. Mr. Miller testified during cross-examination that he did not review the discovery deposition testimony of Donna Seltin. *Id.* The City, however, questioned Mr. Miller about the substance of Ms. Seltin's deposition testimony. *Id.* at 773.

¶ 68    The jury returned a verdict in favor of the City, finding in a special interrogatory that the natural accumulation of ice and snow was the sole proximate cause of plaintiff's injuries. *Id.* at 768. On appeal, plaintiff argued that the trial court erred by allowing the City to impeach Mr. Miller with Ms. Seltin's deposition testimony. *Id.* at 772-73.

¶ 69    The appellate court found that the City had not impeached Mr. Miller because it never questioned him whether Ms. Seltin's statements as to the natural accumulation of ice would have altered his opinions (*id.* at 774); instead, the City asked Mr. Miller whether he was aware of the substance of Ms. Seltin's statements. *Id.* at 773. The appellate court likened the City's questioning of Mr. Miller to "a Trojan Horse used to slip hearsay evidence into the trial." *Id.* at 773. The appellate court held that the improper admission of Ms. Seltin's statements, coupled with certain other errors at trial, necessitated reversal and remand for a new trial. *Id.* at 774.

¶ 70    Defendant here argues that, as in *Rios*, the State used its rebuttal case to improperly slip into evidence his hearsay statement to Detective Martin that he whooped Armaney and hit her on her back. We disagree. Dr. Baden testified that he relied on a written police report of defendant's interview with Detective Martin and his statement as to Armaney appearing sickly as a basis for his expert opinion regarding the timing of Armaney's injuries. The State was properly allowed to test Dr. Baden's opinion by asking him the hypothetical question regarding whether his opinion would change if defendant admitted to whooping and striking Armaney on the back for failing to go to sleep and then connecting up the question with the supporting evidence by introducing the stipulation of defendant's statement to Detective Martin. See *Jagar*, 273 Ill. App. 3d at 966 (counsel may test the expert's opinion by asking if other facts, data or opinions would alter his opinion).

¶ 71    Defendant's argument is also unavailing, as his statement to Detective Martin regarding his whooping and hitting Armaney on her back for her refusal to go to sleep, was an admission by a party-opponent and, thus, non-hearsay. See Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015); *People v. Aguilar*, 265 Ill. App. 3d 105, 110 (1994). Therefore, this was not a case of slipping hearsay evidence into trial in the guise of impeachment.

¶ 72    Defendant next argues that the trial court erred during the State's rebuttal case when it admitted his statement to Detective Martin not only to perfect the State's impeachment of Dr. Baden, but also as substantive evidence. The trial court has broad discretion to admit evidence in rebuttal as it has the power to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence." Ill. R. Evid. 611(a) (eff. Oct. 15, 2015). The trial court may admit rebuttal evidence where it "tends to explain, repel, contradict or disprove the evidence of the defendant." *People v. Daugherty*, 43 Ill. 2d 251, 255 (1969). Evidence that is otherwise properly

admitted in rebuttal is not rendered improper because it could have been introduced during a party's case in chief. *People v. Robles*, 314 Ill. App. 3d 931, 938 (2000).

¶ 73    Defendant's statement to Detective Martin was admissible as substantive evidence in rebuttal as it tended to contradict the testimony of the defense expert, Dr. Baden, regarding his opinion that Armaney's injuries likely occurred before she was brought to defendant's house. Accordingly, the trial court committed no abuse of discretion by substantively admitting the stipulation of defendant's statement to Detective Martin into evidence during the State's rebuttal case.

¶ 74    Next, defendant contends that the trial court erred by admitting Dr. Segovia's expert testimony regarding the timing of Armaney's injuries pursuant to Rules 702 and 703 of the Illinois Rules of Evidence. Defendant forfeited review by failing to object at trial. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

¶ 75    Forfeiture aside, we find no reversible error. Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ill. R. Evid. 702 (eff. Jan. 1, 2011). Rule 703 provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Ill. R. Evid. 703 (eff. Jan. 1, 2011).

¶ 76    Defendant contends that the State failed to lay a foundation for Dr. Segovia's testimony by establishing that she based her opinion on reliable information. In support, defendant cites *People*

*v. Safford*, 392 Ill. App. 3d 212 (2009), which held that " 'the admission of an expert's testimony requires the proponent to lay an adequate foundation establishing that the information upon which the expert bases his opinion is reliable.' " *Id.* at 221 (quoting *Hiscott v. Peters*, 324 Ill. App. 3d 114, 122 (2001)).

¶ 77    The State counters that *Safford*'s analysis is flawed, because under Rule 705, "[t]he expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Ill. R. Evid. 705 (eff. Jan. 1, 2011). The State cites case law holding that under Rule 705, an expert may offer opinion testimony without prior disclosure of underlying facts or data, and that the burden is on the adverse party during cross-examination to elicit the facts underlying the expert's opinion. See *e.g.*, *Robidoux v. Oliphant*, 201 Ill. 2d 324, 334 (2002); *Wilson v. Clark*, 84 Ill. 2d 186, 194 (1981).

¶ 78    We agree with the State. As this court has held:

> "Under Rule 705, an expert, once found qualified, can simply state his opinion. And of course, a full presentation developing in detail the expert witness's qualifications, basis, opinions and reasoning is permissible upon direct examination. Facts, data, and opinions not themselves admitted into evidence may be included in such disclosure if the requirements of [Rule 703] are satisfied. Cross-examination may then be used to reveal the expert's basis for his opinion is inadequate ***." *Henry v. Brenner*, 138 Ill. App. 3d 609, 614 (1985).

¶ 79    In the present case, Dr. Segovia testified on direct examination about her educational and professional background in the field of forensic pathology, and the trial court found her qualified to testify as an expert without objection from defendant. After Dr. Segovia was qualified as an

expert, the State could have continued its direct examination of her by simply asking her to state her opinion regarding the timing of Armaney's injuries, and her cause of death, without disclosing the underlying basis therefor. The burden would have been on the defense to elicit the underlying facts regarding her expert opinion on cross-examination. *Id.*

¶ 80 Review of the record indicates, though, that Dr. Segovia *did* testify on direct examination to the underlying basis of her opinions. Dr. Segovia explained that Armaney weighed 36 pounds and had slightly over one liter of blood circulating through her body, and that she would have been unable to survive more than two hours after the four lacerations to her liver, due to the resulting rapid blood loss into her abdomen. Dr. Segovia further explained that the numerous bruises on Armaney's face and body, as well as the tears to her liver and the subdural bleeding in the brain, are injuries caused by blunt force trauma. Dr. Segovia opined, based on a reasonable degree of medical and scientific certainty, that the manner of death was homicide.

¶ 81 On his cross-examination of Dr. Segovia, defendant attacked the basis of her opinions. Defendant brought out that Dr. Segovia had not measured the quantity of blood in Armaney's abdomen, and elicited testimony that if Armaney had suffered a subcapsular hematoma in which the membrane surrounding the liver had remained intact, her rate of blood loss would have been slower and she could have survived longer than two hours. Defendant also elicited an admission from Dr. Segovia that despite her testimony on direct examination that Armaney died from "multiple injuries due to a beating," her cause of death was only from the blood loss from the lacerations to the liver, and not from the bruising on her face and body and the subdural hematoma of the brain.

¶ 82 We find that Rule 705 was satisfied here, where Dr. Segovia was qualified as an expert and testified to her expert opinions and the basis therefor on both direct and cross-examination. The

trial court committed no abuse of discretion by admitting Dr. Segovia's expert testimony. See *People v. King*, 2020 IL 123926, ¶ 35 (we review the trial court's decision to admit expert witness testimony for an abuse of discretion). Any discrepancies between Dr. Segovia's direct examination and her cross-examination regarding the basis of her opinions went to weight, not admissibility, and were for the jury to resolve. *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 38.

¶ 83     Next, defendant contends that the State made improper remarks during closing argument, depriving him of a fair trial. Defendant forfeited review by failing to object at trial. *Enoch*, 122 Ill. 2d at 186.

¶ 84     Forfeiture aside, we find no reversible error. A prosecutor is allowed wide latitude during closing arguments, and may comment on the evidence presented at trial, as well as any fair, reasonable inferences therefrom. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005); *People v. Cook*, 2018 IL App (1st) 142134, ¶61. On review, we consider the challenged remarks in the context of the record as a whole, in particular the closing arguments of both sides. *People v. Williams*, 313 Ill. App. 3d 849, 863 (2000). Statements are not improper if they were provoked or invited by defense counsel's argument. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Reversal is warranted only if the prosecutor's improper remarks substantially prejudiced defendant, that is, if the remarks constituted a material factor in his conviction. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 85     We apply an abuse of discretion analysis to determinations about the propriety of a prosecutor's remarks during argument, but we review *de novo* the legal issue of whether any improper remarks by the prosecutor were so egregious as to warrant a new trial. *People v. Cook*, 2018 IL App (1st) 142134, ¶ 64.

¶ 86     First, defendant argues that the prosecutor misstated the evidence by arguing that Armaney had "her liver nearly torn in half" and that defendant "beat her until he tore apart her liver" and

that defendant "was the only person in the entire world that day that could have done this." The prosecutor's remarks were supported by Dr. Segovia's testimony regarding the four tears to Armenia's liver resulting from blunt force trauma and the timing of the injuries, as well as from defendant's confession to striking Armaney; we find no reversible error.

¶ 87   Next, defendant argues that the prosecutor misstated the evidence by arguing, "Flash forward to that EMT call, 911, near 4 p.m. EMTs arrive within moments, and she is already unresponsive. She is already cold to the touch. She is not breathing, no pulse. She is also gone at that point in time. Any hope in reviving her from what he did to her was now gone." The prosecutor's comment was supported by the testimony of Patrick O'Connell, the ambulance commander who arrived at defendant's house in response to the 911 call and administered treatment to Armaney. Mr. O'Connell testified that upon arrival, he found that Armaney was unconscious and not breathing, she had no pulse, and she felt cool to the touch. Mr. O'Connell attempted to revive Armaney, but he was unsuccessful. The prosecutor's comment was also supported by the testimony of Dr. Musyoka, who treated Armaney at the hospital and also testified that she was cool to the touch and had been deceased "for awhile." Thus, the prosecutor's comment was an accurate recitation of Mr. O'Connell's and Dr. Musyoka's testimony and did not constitute reversible error.

¶ 88   Next, defendant contends that the prosecutor made an improper argument when he referenced defendant's statement to Detective Martin in which he "admit[ed] to whooping" Armaney. Defendant contends that his statement to Detective Martin was admitted for impeachment purposes only, but that the prosecutor argued as if it had been substantively admitted. Defendant's contention is without merit, because as we discussed earlier in this order, defendant's statement to the detective was properly admitted during the State's rebuttal case as substantive

evidence to contradict the testimony of Dr. Baden; accordingly, the prosecutor's reference to defendant's statement was not in error.

¶ 89    Next, defendant contends that the prosecutor improperly shifted the burden of proof to him during rebuttal argument by stating that he did not tell the paramedics who treated Armaney that someone other than him had injured her. We find no reversible error, where the prosecutor's comment was invited by defense counsel's argument that there were other people in defendant's house who could have injured Armaney.

¶ 90    Next, defendant contends that the prosecutor misstated the evidence by arguing:

"Two hours you could live with your liver in that condition, two hours. She was cold to the touch. It takes a long time to get cold. I'm a little chilly now, although I don't think I'm 94.4. It takes a long time for the body to cool off. You heard that from the ER doctors. You heard that from Dr. Segovia. It takes a long time. You can't live more than two hours."

¶ 91    We find no reversible error, where the prosecutor's comments were supported by O'Connell's testimony that Armaney was "very cool," Dr. Musyoka's testimony that Armaney's body temperature was 94.4 degrees, indicating that she had been "deceased for awhile," and Dr. Segovia's testimony that Armaney could not have survived her liver injuries for more than two hours.

¶ 92    Next, defendant contends that the prosecutor misstated the evidence by arguing that:

"Dr. Segovia did not do tests [to pinpoint the exact age of Armaney's bruises.] Well, we talked about that with Dr. Segovia. Dr. Segovia, did you do these tests, no. Why, because they're not reliable, because they can't give you the information that you think that you might want because we cannot do tests on children. The only way to know what they're saying is to do tests on children, and that doesn't happen unless you go old school

-27-

and you just eyeball the pictures and you say, oh, that one looks a little brown. Dr Segovia told you about the literature. She told you that it mostly has to do with adults, and she told you it doesn't apply to children in this modern era."

¶ 93    The prosecutor's comment was an accurate recitation of Dr. Segovia's testimony on redirect examination, in which she was asked whether there was a "magic test" to pinpoint the exact age of Armaney's bruises, and she responded no, and explained that the literature on wound histology does not apply to children.

¶ 94    Next, defendant argues that the prosecutor improperly inflamed the passions of the jury by arguing that Armaney's injuries "looks like she got hit by a bus." Given Dr. Segovia's detailed testimony regarding Armaney's numerous external injuries to her face and body, and the internal injuries to her brain, small intestine, and liver, the "hit by a bus" reference was a fair comment on the evidence. See *People v. Sims*, 2019 IL App (3d) 170417, ¶ 46 ("The prosecutor may remark on the evidence and on any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on the defendant.").

¶ 95    Finally, defendant argues that the prosecutor misstated the evidence by arguing that the defense expert, Dr. Baden, had "not actually read any of the documents that he [was] given." This comment was obviously a sarcastic reference to Dr. Baden's admitted failure to review defendant's statement to Detective Martin that he had whooped Armaney. However, the comment, which indicated that Dr. Baden had failed to review *any* of the documents given to him, was not an accurate reflection of the evidence, which showed that Dr. Baden had reviewed at least some of the documents given to him to review. We cannot say that this isolated comment was a material factor in defendant's conviction, though, given all the evidence against him, and as such the error was harmless. See *Wheeler*, 226 Ill. 2d at 123.

¶ 96     For all the foregoing reasons, we affirm the circuit court.

¶ 97     Affirmed.